IRVING KING *v.* STATE OF MARYLAND

[No. 219, September Term, 1971.]

*Decided February 8, 1972.*

386

The cause was argued before ANDERSON, ORTH and CARTER, JJ.

*Edward J. Angeletti* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Arthur S. Cheslock, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

CARTER, J., delivered the opinion of the Court.

The appellant Irving King was convicted by a jury in the Criminal Court of Baltimore of murder in the second degree and sentenced to ten years in prison. He appeals from this judgment contending, 1) the evidence was legally insufficient to justify his conviction, 2) the denial of his motion for a mistrial was prejudicial error, and 3) the refusal of the court to give additional jury instructions was reversible error.

The hospital report showed the deceased died on August 25, 1969 at 5:30 a.m. or about an hour prior to her admission. The autopsy report showed that the injuries which had caused death had been suffered between 1 and 4 a.m. on August 25. Examination of the body showed numerous bruises, abrasions, and hematomas disseminated over the deceased's neck, chest, and face. There was also a series of linear and partially curved hemorrhages in the skin around the neck and chest area which indicated that they were probably caused by a cloth being twisted tightly about the deceased's neck. The cause of death was diagnosed as a lack of oxygen due to obstruction of the voice box as a result of hemorrhaging and swelling in that area.

The appellant was living in a common-law relationship with the deceased Beatrice Wolfe at the time of her death. About noon on August 24, the appellant and the deceased encountered a friend Dorothy Mitchell at a tavern. In the course of conversation Beatrice told Dorothy within the hearing of the appellant that she did not love him and had never loved anyone except Bob Smith and another man whom she named. Upon hearing this remark the appellant struck Beatrice with the back of his hand and knocked her off the bar stool. About this time Bob Smith entered the tavern and a fight ensued between him and the appellant resulting in Smith's being struck and cut. After the fight the appellant left the bar and thereafter Beatrice and Smith left together.

The next appearance of Beatrice and Smith is at 10 p.m. on August 24 when they arrived at the apartment of Norman Bonifant, who was a friend of Smith. While

Beatrice and Smith were socializing with Bonifant and his girl friend Louise Ayres inside the apartment, the appellant rapped on the back window in a belligerent manner inquiring whether Smith and Beatrice were there. At that time, about 1:30 a.m., Mrs. Smith, wife of Bob Smith, and two other friends of hers including Mrs. Mitchell also appeared at the Bonifant apartment. Smith then hurriedly left the premises before the entrance of the appellant and the three women. According to the testimony of Bonifant, Mrs. Smith, and Mrs. Mitchell, when the appellant entered the apartment he grabbed Beatrice by her "pony tail", threw her from the bed to the floor, and smacked her in the face during his accusation that she had been intimate with Smith. These same three witnesses further stated that as the three women were leaving the apartment about 2:30 a.m., Beatrice begged them not to leave her saying, "If you leave me, he'll beat me to death."

The apartment consisted only of a bedroom and a kitchen. Bonifant and Louise Ayres both testified that after the three women had left, the argument between the appellant and Beatrice had continued, one accusing the other of "running around" and that eventually the appellant had given each of them some sleeping pills. They further testified that they both took the pills and fell asleep on an improvised bed on the kitchen floor about 3:30 a.m. at which time the appellant and Beatrice had continued to argue in the adjoining bedroom. They further stated that about 6:00 a.m. the appellant had awakened them and advised them something was wrong with Beatrice. Bonifant then assisted the appellant in placing Beatrice in the appellant's car. The deceased was pronounced dead upon her arrival at the hospital at 6:28 a.m.

The appellant testified that he had been living with Beatrice for about 3 or 4 months prior to her death and that he loved her. He was concerned about her relationships with other men. He further stated that he was not angry with her on August 25 and had not physically

harmed her in any manner on that date. He stated that after the three women had left Bonifant's apartment, he had procured a glass of water for Beatrice and she had then gone to sleep in the bedroom. He further stated that after giving Beatrice the glass of water he had gone to the kitchen with Bonifant and Louise Ayres about 3:30 a.m. and had remained there sitting at the kitchen table until about 6:00 a.m. About 6:00 a.m. he discovered Beatrice in an unconscious condition and then called Bonifant.

# I

The test to be applied in determining the legal sufficiency of the evidence in a criminal case is well settled. In defining that test we said in *Williams v. State,* 5 Md. App. 450 at page 459:

> "* * * the admissible evidence adduced must show directly or support a rational inference of the facts to be proved, from which the jury could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged. * * *"

In speaking of the application of this test to circumstantial as well as direct evidence, this Court said in *Metz v. State,* 9 Md. App. 15 at page 23:

> "In short, we feel that the test for sufficiency is the same whether the evidence be direct, circumstantial, or provided by rational inferences therefrom."

See also *Nichols v. State,* 5 Md. App. 340, 350. In speaking of the various degrees of unlawful homicide, we said in *Dyson v. State,* 6 Md. App. 453 at page 456:

> "* * * In absence of justification, excuse or some circumstance of mitigation all homicides are presumed to be committed with malice and to be murder in the second degree. *Davis v. State,* 237 Md. 97, 205 A. 2d 254, cert. denied,

86 S. Ct. 402, 382 U. S. 945, 15 L.Ed.2d 354; *Jacobs v. State,* 6 Md. App. 238; *Brown v. State,* 4 Md. App. 261, 267, 242 A. 2d 570; and *Williams v. State,* 2 Md. App. 170, 176, 234 A. 2d 260. There is no evidence here of anything in the nature of justification, excuse or mitigation; therefore, the verdict of guilty as to murder in the second degree is amply supported by the evidence. See *Fabian v. State,* 235 Md. 306, 201 A. 2d 511."

In speaking of the burden of proof in establishing that the accused comes within any of the exceptions of justification, excuse or circumstances of mitigation so as to reduce a homicide to manslaughter, we said in *Jacobs v. State,* 6 Md. App. 238 at page 242:

"* * * It is a well settled proposition that the law presumes that in the absence of justification, excuse or some other circumstance of mitigation, all homicides are committed with malice and thereby constitute murder in the second degree, *Williams v. State,* 2 Md. App. 170, 176, 234 A. 2d 260; and that the burden is upon the accused to prove that she comes within the exceptions, *Bruce v. State, supra, Brown v. State,* 4 Md. App. 261, 267, 242 A. 2d 570. There is no obligation on the jury to believe the testimony of the accused or of her witnesses, *Nichols v. State,* 5 Md. App. 340, 351, 247 A. 2d 722, *Melia v. State,* 5 Md. App. 354, 366, 247 A. 2d 544. * * *"

We conclude that the evidence was legally sufficient to justify the jury in finding beyond a reasonable doubt that during the early morning hours of August 25 the appellant strangled the deceased about the throat with some type of cloth while the other occupants of Bonifant's apartment were asleep and that such strangulation

was the direct and proximate cause of her death. Since there is no evidence to show justification or excuse or circumstances in mitigation, the law presumes the homicide to be murder in the second degree. *Jacobs, supra,* and *Dyson, supra.* Furthermore, irrespective of this presumption the evidence in the instant case is legally sufficient in itself to justify the jury in finding an intent on the part of the appellant to kill or inflict grievous bodily harm upon the deceased which is legally sufficient to support a verdict of second degree murder. We so held in *Lindsay v. State,* 8 Md. App. 100, 105 by applying the rule that in the absence of evidence to the contrary, a person is presumed to intend the natural and probable consequences of his acts. We therefore hold that the evidence was legally sufficient to justify the jury in finding the appellant guilty of murder in the second degree.

## II

At the conclusion of the cross examination of the appellant by the Assistant State's Attorney, Judge Sodaro asked him the following questions and received the following answers.

"THE COURT: Well, did you accuse Beatrice of being unfaithful to you and having an illicit relationship with Mr. Smith? THE WITNESS: No, sir.

THE COURT: You didn't do that? A. No sir.

THE COURT: Why did you go in back of Norman's house instead of going through the front if you weren't angry with her? A. I wasn't angry.

THE COURT: Weren't you looking for her that night?

A. Margaret was looking for Bob and she asked me to go with her.

THE COURT: She asked you, but you didn't ask her?

A. No sir. She come in the bar after me, I was sitting in the bar in the New Deal.

THE COURT: You told the police, I don't know how she died. Do you know how she died?

A. No, sir, I still don't know.

THE COURT: You still don't know? A. No more than what the doctor said here and what was said on the stand.

THE COURT: Did you see anybody choke her or put bedspreads or clothes around her neck?

A. No sir.

THE COURT: You didn't see Mr. Norman (Bonifant) do that, did you?

A. No sir.

THE COURT: You didn't see this other lady that just testified a few minutes ago do that, did you?

A. Which one is that?

THE COURT: The one that just testified who came up here from Virginia? A. Louise? Q. Louise? A. No sir.

THE COURT: Do you know how she got choked? A. No sir.

THE COURT: You don't know that? Alright.

MR. CHESLOCK: No further questions, your Honor.

MR. ANGELETTI: I would like to have permission to approach the bench with the reporter."

At the bench conference which followed the judge's questions, defense counsel made a motion for a mistrial on the basis that the court had deprived the appellant of

a fair trial because the judge's questions had attacked his client's credibility in the presence of the jury. The court denied the motion on the grounds, 1) that the questions were proper, and 2) that defense counsel had failed to enter a timely objection.

In speaking of the right of a trial judge to intervene in the questioning of a witness so as to insure that the full facts necessary for a just decision are developed, this Court said in *Jefferies v. State,* 5 Md. App. 630 at page 632:

> "Jefferies also alleges that the trial judge abused his discretion with 'officious intermeddling with the prosecution and defense.' * * * In *Madison v. State,* 200 Md. 1, 87 A. 2d 593 the Court of Appeals specifically affirmed the right of the trial judge to intervene into the questioning of witnesses. Although the number of questions asked by the trial judge in this particular case would exceed those normally asked by a trial judge this fact alone does not mean that Jefferies' trial was in any way unfair; on the contrary it tends to show that the trial judge was being meticulously careful to make sure that the full facts were brought out * * *."

See also *Gerstein v. State,* 10 Md. App. 322. In ruling that a trial judge's questions which had a bearing on the defendant's credibility were not improper, the Court of Appeals in *Madison v. State, supra,* said at page 12:

> "* * * A judge's right to ask questions is not confined to questions which have no possible bearing on credibility. As we have said, in the instant case practically all relevant questions involve defendant's credibility. * * *"

Even assuming that the appellant reserved his right to raise the propriety of the court's questioning by his objection made immediately following the questioning rather than during the questioning, he has nevertheless

failed to show any abuse of discretion by the trial court in denying his motion for a mistrial. Applying the holdings and rationale of *Jefferies, supra* and *Gerstein, supra* to the evidence, we conclude that the questions asked by Judge Sodaro were designed only to elicit the full facts of the case which as the presiding judge he was authorized to do. We further conclude that even though some of the questions asked did relate to the credibility of the appellant, they did not do so improperly nor to the extent of adversely affecting the appellant's right to a fair trial before the jury or of otherwise depriving him of due process of law.

## III

Counsel for the appellant excepted to that part of the court's instruction which stated that the burden of showing mitigating circumstances sufficient to reduce the offense to manslaughter was upon the defendant without requiring the jury to first find "as a fact the defendant was the cause of death." In reply to this exception Judge Sodaro gave the following supplemental instruction to the jury.

> "If the jury finds that this man did not commit any crime at all then they should return a verdict of not guilty."

After this comment by the court, counsel for the appellant said:

> "I have no other request."

Since the appellant made no objection to the court's supplemental instruction, the sufficiency and validity thereof is not before this Court for review. (Md. Rule 756 g). However, assuming without deciding that the appellant's objection immediately preceding the supplemental instruction was sufficient to encompass the supplemental instruction, the objection would nevertheless be without merit. The request that the court instruct the jury they must first find that the appellant caused the deceased's

death before they could consider the question of manslaughter was adequately covered by the court's general instructions dealing with the issue of guilt. There was therefore no error in the court's refusal to repeat the same proposition again.

*Judgment affirmed.*