536 A.2d 99

Avery V. **FERRELL**

v.

**STATE of Maryland.**

**No. 213, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Jan. 18, 1988.

John L. Calhoun, Towson, for appellant.

Valerie J. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City and William Townsend, Asst. State's Atty. for Baltimore City, on brief), Baltimore, for appellee.

Argued before WILNER, BISHOP and ROBERT M. BELL, JJ.

WILNER, Judge.

Just after 7:00 on the morning of April 10, 1985, a man brandishing a handgun and wearing a three-quarter length gray coat, white tennis shoes, and a ski mask robbed three women and a child standing at a bus stop in Baltimore City.

He took a purse from each of the women and a school bag from the child. During the course of the robbery, a shot was fired. One of the victims—Mary Henderson—followed the robber as he made his escape and reported seeing him heading toward Swann Avenue, changing his clothes as he ran.

Police officers responded promptly. From the information obtained from the victims and from an anonymous call, several of them went looking for the assailant in the Uplands Apartment development, located on Swann Avenue about a block from the bus stop. Officer Wagner observed appellant emerging from the building at 405 Swann Avenue dressed in a blue-gray suit and carrying a gray jacket in one hand and a shopping bag in the other. Appellant walked away from the officer, at an increasingly brisk pace. When he got to a corner, he dropped the shopping bag and ran behind one of the buildings. Officer Wagner saw appellant cross Swann Avenue and go into the building at 400 Swann Avenue; he relayed that information by police radio to Officer Brown, who was also on the scene searching for the robber.

Officer Brown saw appellant go into 400 Swann Avenue carrying a gray coat; he followed him in and brought him back outside. Officer Garrity then arrived with the victims. Inside the shopping bag, picked up by Officer Wagner, were three purses, which the women, respectively, identified as their own, a ski mask, a glove, and a handgun containing five live rounds and one spent cartridge. Several of the victims identified the gray coat taken from appellant as looking like the coat worn by the robber. Also inside the shopping bag was a black vinyl case containing certain papers belonging to appellant.

None of the victims was able to identify appellant as the masked robber. Although the shopping bag certainly was full of incriminating evidence, appellant, directly disputing Officer Wagner's testimony, contended that he never had the shopping bag. He claimed that he was on his way to the Westside Skill Center, that he had stopped at 400 Swann

Avenue to meet one Karen Lucas, a fellow student at that center, and that his school papers allegedly found inside the shopping bag, had been in his coat pocket.

As a result of this incident, the State's Attorney filed four criminal informations against appellant (Nos. 28514739–28514742), each charging him with the following eight offenses:

Count 1—Robbery with a deadly weapon;

Count 2—Attempted robbery with a deadly weapon;

Count 3—Robbery;

Count 4—Assault with intent to rob;

Count 5—Assault;

Count 6—Theft of less than $300;

Count 7—Use of a handgun in the commission of a crime of violence; and

Count 8—Unlawful carrying of a handgun.

Appellant was first brought to trial on all of these charges in November, 1985. He was convicted on all four counts of robbery with a deadly weapon (Count 1 of each information) and apparently on Counts 3, 5, 6, 7, and 8 of each information as well. It is not clear what happened to Counts 2 and 4, except that there is no indication (and appellant makes no contention) that he was acquitted on those counts at that time.

On February 22, 1986, the court granted appellant's motion for new trial on all counts set forth in the four informations.[1] He was brought to trial again in June, 1986; on that occasion, the jury was unable to reach a verdict on any of the counts, and so a mistrial was declared.

Appellant's third trial took place in August, 1986. Precisely what occurred at that trial is not altogether clear from the record before us—a matter we shall discuss in more detail later. It appears, however, that only five counts were submitted to the jury—the four flagship counts

---

1. In a separate (fifth) information, appellant was charged with assault with intent to murder. The jury acquitted him of that charge.

of robbery with a deadly weapon and one count of use of a handgun in the commission of a felony. The jury acquitted of the latter offense [2] but, once again, was unable to agree on Count 1.

Undaunted by its three false starts, and now down to only one count in each information, the State decided to try again. Prior to his fourth trial, appellant moved to dismiss Count 1 (of each information) on the related grounds of double jeopardy and collateral estoppel. His argument centered solely on the effect of his acquittal on Count 8. He posited that the only deadly weapon indicated by the evidence was a handgun, that his acquittal on Count 8 sufficed as a finding that he had not used a handgun, and that, *ergo*, a fact necessary to his prosecution on Count 1 had been decided in his favor and could not be re-litigated. That conclusion, he urged, was mandated by *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

The court denied his motion, whereupon he was brought to trial for the fourth time on Count 1 of each information. He was convicted on all four charges, given substantial sentences, and appeals. He raises six issues, to which, *nostra sponte*, we have added a seventh. In the end, we shall affirm.

### (1), (2)

### Double Jeopardy/Collateral Estoppel

■ In the "Statement Of The Case" section of his brief, appellant informed us that, at his third trial, the court

---

**2.** From everything that followed, it is apparent that the handgun count submitted to the jury in the third trial was actually Count 7 of the information—use of a handgun in the commission of a crime of violence—and not Count 8, charging unlawful carrying of a handgun. The parties have consistently referred to the acquittal as Count 8, however. The original information contained nine counts. At some point, Count 6, charging theft, was struck and the ensuing Counts 7, 8, and 9 were renumbered as Counts 6, 7, and 8, respectively. The "use of a handgun" charge, originally Count 8, became Count 7. In order to maintain consistency with the statements and arguments in the briefs, we shall refer to the handgun charge submitted to the jury at the third trial as Count 8.

disposed of Counts 2 through 7 of each information by granting "judgments of acquittal" as to them. The State did not challenge that assertion in its brief, and indeed the docket entries for the third trial clearly indicate that disposition.[3]  Aware that Count 3 of each information charged simple robbery, a necessary included element in robbery with a deadly weapon, we questioned whether, in light of that disposition, retrial on Count 1 might be precluded under *Wright v. State*, 307 Md. 552, 515 A.2d 1157 (1986). Given the generally dismal state of the record,[4] however, we directed the parties to address that issue and, if necessary, to supplement the record in order to address it.

In response to that order, the State filed certain excerpts from the transcript of proceedings at the third trial, which we have accepted as a supplement to the record.  Md.Rule 1027.

At the conclusion of the State's case at the third trial, defense counsel moved for judgment of acquittal, arguing briefly that the State had failed to show "that the evidence seized was in possession of my client and that he is, in fact, the robber that's involved in this case."  The motion was denied.  At the end of the entire case, counsel renewed the "motion for judgment of acquittal at this time for the same

---

**3.**  The entry for August 11, 1986, states: "As to each [information], oral motion for judgment of acquittal heard and denied as to the *1st* and *8th* Counts and granted as to the *2nd, 3rd, 4th, 5th, 6th, 7th* Counts. Bothe, J."

**4.**  Just by way of example, we observe that (1) the *original* docket entries were not included, (2) several critical State's exhibits are omitted, (3) the court reporter who recorded the proceedings of November 17 showed the case being tried before Judge Hubbard when in fact it was tried before Judge Bothe, and (4) two quite different exhibits are shown as admitted as State's Exhibit 2, neither of which are included in the record.  We note further that, in clear derogation of the requirements set forth in The Maryland Court Reporters' Manual, published by the Administrative Office of the Courts, the transcripts of the fourth trial do not contain a table of contents showing "all exhibits and where they are marked for identification and received in evidence." *Id.*, Subject: Appeal Transcript of Proceedings, p. 2.  Indeed, the transcript for November 17 has no table of contents at all.

reasons...." Without responding to the motion, the court asked the prosecutor which counts he was pressing; he replied that he wanted "the four armed robbery counts and the four handgun counts to go to the jury." The judge then said that it was her practice in multiple robbery cases to send only one handgun count to the jury, as she was not inclined to give consecutive sentences if there were multiple convictions on that count. The prosecutor indicated no objection to that approach. The colloquy then concluded thusly:

"THE COURT: Now, do you [defense counsel] have any argument as to the first and eighth counts?

MS. JULIAN: No, your Honor. I'll submit on the record on the motion.

THE COURT: All right. Well, it will go to the jury as to each of the indictments [*sic*, informations] on the first and eighth counts although I will only require one verdict as to the eighth."

From this, it is clear that the docket entry for August 11 is indeed in error. The court never entered a judgment of acquittal as to Counts 2 through 7, and it certainly never ruled, or even suggested, that the evidence presented by the State was legally insufficient with respect to those counts. It is apparent that the State simply decided not to press those middle counts, as in *Bynum v. State,* 277 Md. 703, 357 A.2d 339, *cert. denied* 429 U.S. 899, 97 S.Ct. 264, 50 L.Ed.2d 183 (1976). The predicate for the Court's ruling in *Wright v. State, supra,* 307 Md. 552, 515 A.2d 1157—a finding by the trial court of evidentiary insufficiency on a lesser included offense—is missing here. On the more complete record, therefore, we find no merit to the issue that appeared to be very real from the record as we received it.

*Appellant's* double jeopardy/collateral estoppel argument, as we observed, rests on the implication he draws from his acquittal on Count 8. In *Powers v. State,* 285 Md. 269, 401 A.2d 1031, *cert. denied* 444 U.S. 937, 100 S.Ct. 288, 62 L.Ed.2d 197 (1979), the Court of Appeals, after reviewing

what it regarded as the relevant pronouncements of the Supreme Court, concluded that

> "the doctrine of collateral estoppel applies after a jury, at a single trial, acquits on one count of a multicount indictment and is unable to agree upon a verdict on a related count of the same indictment *involving a common issue of ultimate fact, which if found in favor of an accused would establish his innocence on both counts.*"

*Id.*, at 288, 401 A.2d 1031. (Emphasis added.)

As initially pointed out in *Ashe v. Swenson, supra,* 397 U.S. at 444, 90 S.Ct. at 1194, and as reiterated in *Powers* and later in *Wooten–Bey v. State,* 308 Md. 534, 544, 520 A.2d 1090 (1987), collateral estoppel in criminal cases "is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." Quoting from *Ashe,* the *Wooten–Bey* Court held that the reviewing court must "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id.*

Appellant has not given us much of an opportunity to do that, for no part of the proceedings of the third trial, save the few pages of transcript dealing with the disposition of Counts 2–7, furnished by the State in response to our order, has been included in the record. We don't know, other than in a general way, what evidence was presented to that third jury; nor do we know what instructions were given or what argument was made to the jury.

Appellant's position is very simple and direct: "[T]he use of a deadly weapon is a necessary element for conviction under Article 27, Section 488. Here the Appellant was found not guilty of the use of the handgun in the third trial. The only State theory of the case was that a handgun was involved."

The State has a somewhat more conjectural view. It notes, on the one hand, that the robber wore a mask, that none of the victims were able to identify appellant, and that he was dressed differently when apprehended than was the robber at the time of the robbery; on the other hand, it stresses that he was in possession of the gun and the fruits of the crime shortly before his apprehension. From this, the State posits that the third jury may have concluded that appellant was not the actual robber (or wielder of the handgun) but may have entertained some feeling, short of unanimity, that he was an accomplice of or receiver for the actual robber, who escaped. That possibility, it argues, is not irrational under the evidence, and it would explain the acquittal on Count 8 and the inability to agree on Count 1. Indeed, the State notes that, at one point, defense counsel entertained the same notion based, apparently, on her conversation with some of the jurors on the third jury. At sentencing in this proceeding, she stated to the court:

"[I] made a note and I remember going over that prior to this trial. Some of the jurors were saying that they could not agree, they could not say he was the actual gunman because the man's face was covered but they felt ... [interruption by court] he was somehow involved. So I believe they had a theory there was more than one person involved and some way or another he came across the bag but was not the gunman."

In the absence of a more complete record of the third trial, which appears to have been available and which was appellant's duty to produce, it is impossible for us to make an objective analysis of which view is sounder.[5] But that is not really the test. The test framed in *Ashe, Powers,* and

---

**5.** The trial judge seemingly rejected that notion when suggested by defense counsel, stating that "[n]o one ever proposed more than one individual committed this crime. I don't even believe I instructed them on participation in the last trial because there's never been any indication that more than one person had a handgun, used a handgun, committed the four armed robberies...." She expressed the belief that the jury "was totally ignorant of its responsibilities as jurors."

*Wooten–Bey* is "whether a rational jury *could have* grounded its verdict," as the State suggests, or other than as appellant suggests. Notwithstanding the trial judge's thoughts, from what is before us, we believe that the jury could have done so. With or without an accomplice instruction, members of the third jury could rationally have believed that appellant was criminally involved but was not the actual gunman. If *that* were the basis of its verdict on Count 8, the acquittal would not necessarily involve "a common issue of ultimate fact, which if found in favor of [appellant] would establish his innocence on both counts."

### (3)

### Partiality Of The Trial Judge

Appellant complains that the trial judge, Judge Bothe, "harangued defense counsel from day one, aided the able prosecutor whenever possible and presided in a totally narrow minded fashion, denying Appellant a fair and impartial trial." More particularly, he asserts that the judge "made short shrift of Appellant's collateral estoppel argument," that she "breezed through" a motion to stay to allow him to file an immediate appeal from the denial of his motion to dismiss, that she failed to "formally rule" on a motion to recuse herself, that she attempted to "assist the State" in its examination of Officer Brown, that she "went out of her way to rehabilitate the impeached officer," that she "commenced arguing ... with defense counsel" and "went into a diatribe with counsel which was somewhat unintelligible," that she interrupted questioning by defense counsel, that her "predisposition" was "overwhelmingly against" appellant, and that "[h]er attitude was hostile."

These are, of course, very serious charges which, if true, would require a reversal. To determine whether, and to what extent, they *are* true, we have read nearly the entire transcript of the proceeding. Several conclusions emerge.

Appellant's statements that Judge Bothe "made short shrift" of his collateral estoppel argument and "breezed through" his motion for stay are wholly unfounded. Judge

Bothe said that she had read the written motion to dismiss and some of the cases cited; she listened to counsel's argument but made clear that she simply did not agree with it. Counsel continued to press a point that the judge, on several occasions, said she found unpersuasive. The colloquy pertaining to that motion extended over 21 pages of transcript. As to the motion for stay, Judge Bothe noted that, with the three previous trials, the case had dragged on for over a year, and she could see no good reason to delay the ultimate resolution of appellant's guilt or innocence any longer. Her concluding statement, which appellate counsel seems to take wholly out of context, was:

> "Let the record reflect I read your cases. I read your memorandum. I read Pulley, and I cannot understand why the defendant is so reluctant to bring this case to finality. It's really a travesty that it has had to go on for so long without resolution. Let's hope this time a conclusion can be reached." [6]

Appellant did, as he claims, then ask Judge Bothe to recuse herself

> "because of the manner in which the case is proceeding and has proceeded so far, the anger expressed at counsel while trying to put the motion on the record, the fact that he does not feel like he will get a fair trial, having had the case heard in this court before."

The court made no direct ruling on this motion; the judge simply ignored it and went on to other business. That, of course, was not only discourteous, but improper; appellant was entitled to a response. It is clear, however, that the motion was implicitly overruled, for Judge Bothe certainly did not recuse herself, and appellant never pressed for a response. On the merits, we find no basis at that point for a recusal. Neither the loss of pretrial motions nor the fact

---

**6.** The "travesty" referred to by Judge Bothe was the delay in resolution. In his brief, counsel accuses the judge of stating that "the *case* was a 'travesty' to that point." (Emphasis added.) That is a flat-out misstatement.

that Judge Bothe had presided at the third trial would be sufficient grounds to require recusal; and, although we cannot discern voice inflections or mannerisms from a transcript, we can find nothing in the written record to demonstrate anger on the part of the judge.

■ The major thrust of appellant's argument goes to the judge's intervention in the questioning of certain witnesses and to arguments that took place between Judge Bothe and defense counsel. A good bit of this took place during counsel's cross-examination of Officer Brown, when counsel attempted to point out and examine the officer with respect to perceived inconsistencies between his current testimony and testimony given at the earlier trials.

Judge Bothe did indeed step in at several points to clarify questions posed by counsel or to give the witness an opportunity to explain or clarify the alleged inconsistencies. Some of these intrusions were in response to objections by the prosecutor to particular questions or to the form of the cross-examination; some were *sua sponte* but to which no immediate objection by appellant was made; some were wholly unnecessary and served only to provoke an argument with defense counsel.

In *Bell v. State*, 48 Md.App. 669, 678, 429 A.2d 300, *cert. denied* 291 Md. 771 (1981), we cautioned that:

"The trial judge's role is that of an impartial arbitrator and that appearance is not generally compatible with an inquisitorial role. It is the better practice for a trial judge to inject himself [or herself] as little as possible in a jury case ... because of the inordinate influence that may emanate from his [or her] position if jurors interpret his [or her] questions as indicative of his [or her] opinion."

When a judge interjects himself or herself into a case to any significant extent, as, despite prior admonitions from this Court, Judge Bothe seems wont to do (*see McMillian v. State*, 65 Md.App. 21, 499 A.2d 192 (1985)), he or she invites this kind of argument and risks not only a reversal of the

conviction but embarrassing censure as well. *See* Md.Rule 1231 (Md.Code of Judicial Conduct), Canon 3A.

The major confrontation between Judge Bothe and defense counsel came, as we indicated, during cross-examination of Officer Brown, the arresting officer. Most of it arose from an attempt by counsel to show that some of the details mentioned by the witness in his current testimony had not been mentioned by him in testimony given at earlier trials. It was not clear, however, that the witness had ever been asked about those details at the prior trials; counsel did not show the witness the transcript of his earlier testimony or call his attention to specific questions and answers but simply challenged him for including some details for the first time. The court felt that was improper; counsel persisted; and an argument ensued.

Having considered the record as a whole and viewing the judge's interruptions and comments complained about in context, we conclude, as we did in *McMillian v. State, supra,* 65 Md.App. 21, 27, 499 A.2d 192, that "while the court should certainly have exercised greater restraint, the remarks were not tantamount to reversible error."

### (4)

### Suppression Of Officer Wagner's Testimony

Just before the actual commencement of trial, defense counsel moved *in limine* to suppress the entire testimony of Officer Wagner on the ground that he had committed perjury. This, in turn, was based on the assertion that, at appellant's second trial, Officer Wagner testified that he had observed appellant exit the building carrying the shopping bag, whereas at the third trial he said only that he saw appellant holding the bag and placing it down.

■ Our first response to appellant's complaint is that it was not preserved for appellate review. No objection was made to Officer Wagner's testimony at trial and no motion was made to strike it on this or any other ground. A pretrial motion *in limine* alone does not suffice to preserve an objection to evidence. *See Offutt v. State,* 44 Md.App.

670, 677, 410 A.2d 611 (1980); *Eiler v. State,* 63 Md.App. 439, 445–46, 492 A.2d 1320 (1985).

■ Even if the objection had been preserved, we would have found it utterly without merit. How the alleged inconsistency constitutes perjury was a mystery to Judge Bothe and it is a mystery to us. While there may have been some inconsistency in the testimony given at the various trials, a point that was forcefully brought to the jury's attention by defense counsel, there was no evidence of perjury, and certainly no conviction of perjury, which is the necessary predicate for exclusion. See Md.Code Ann.Cts. & Jud.Proc. art., § 9–104: "A person *convicted* of perjury may not testify." (Emphasis added.)

### (5)

### Miranda

■ Officer Brown arrested appellant. He eventually filled out a report known as an arrestee data sheet containing certain information he received from appellant. The information, Brown said, is routinely asked; it includes the defendant's name, address, and date of birth. Brown said that appellant, whose name is Avery V. Ferrell, gave him the name James Edward Ferrell.

Appellant now claims that this "arrestee information" was taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), presumably meaning that adequate warnings were not given to him before this information was sought. Although appellant has failed to supply us with any factual foundation for that assertion, even if it were true there would be no error. As we held in *Grimes v. State,* 44 Md.App. 580, 586, 409 A.2d 767 (1980), *rev'd on other grounds* 290 Md. 236, 429 A.2d 228 (1981): "Until the Court of Appeals directs us otherwise, we shall adhere to the view that routine questions seeking a person's name and address are not proscribed by *Miranda,* and if the person answers such questions, his answers are not rendered inadmissible by the exclusionary rule announced in

*Miranda."* (Footnote omitted.) *Cf. Mills v. State,* 278 Md. 262, 275, 363 A.2d 491 (1976).

## (6)

## Self–Incrimination

Appellant was represented by counsel at all four of his trials. Defense counsel in this case had represented him at his third trial and, although the record is not altogether clear on this, possibly at his first and second trials as well. Appellant had elected to testify in his own defense at one or more (perhaps all) of his earlier trials.

At the conclusion of the State's case, following the denial of appellant's motion for judgment of acquittal, this colloquy occurred:

"[THE COURT:] As to the defendant's testifying or remaining silent, he has been advised of those rights very thoroughly I think, so I don't know that we need to formally do them again. You are aware of your rights in that regard, Mr. Ferrell. Is that right?

THE DEFENDANT: (Nodding affirmatively)

THE COURT: That you can testify or remain silent.

THE DEFENDANT: Yeah.

THE COURT: I don't think we need to review those."

Subsequently, without any further comment, counsel called appellant to testify. Appellant now claims he was not adequately informed of his right to remain silent. We find no basis for that assertion. See *Stevens v. State,* 232 Md. 33, 192 A.2d 73 (1963); *State v. McKenzie,* 17 Md.App. 563, 303 A.2d 406 (1973).

## (7)

## Request for Bench Trial

Appellant, who had elected a jury trial at his three prior trials, contends that, on this occasion, he twice requested a court trial and that the court erred in denying him one. This is an incomplete and misleading statement of what occurred.

Upon resolution of the various preliminary motions, this colloquy ensued:

"THE COURT: Do you want a Court trial or a jury trial, Mr. Ferrell?

THE DEFENDANT: Right now?

THE COURT: Right now, because we are proceeding with the trial right now.

Do you want a Court trial or a jury trial?

THE DEFENDANT: I want a Court trial.

MS. JULIAN: Just a second. May I consult with my client?

(A discussion was held off the record between defense counsel and the defendant.)

THE COURT: Do you want to be tried by a judge, without a jury?

THE DEFENDANT: No.

THE COURT: You want a jury trial; don't you?

THE DEFENDANT: Yes. '

THE COURT: Then you will have a jury trial, and I will preside over it.

MS. JULIAN: Your Honor, I was not finished.

THE DEFENDANT: Your Honor, can I say something?

THE COURT: Go back to the trial table."

The court thereupon directed the prosecutor to call the case, following which it recognized defense counsel:

"THE COURT: Ms. Julian?

MS. JULIAN: Good morning, Your Honor. Elizabeth Julian, Assistant Public Defender, on behalf of Mr. Ferrell.

THE COURT: Mr. Ferrell is praying a jury trial?

MS. JULIAN: Yes, we are requesting a jury trial.

THE COURT: Would you swear the jury, please?

THE CLERK: Members of the jury panel, please stand and raise your right hand.

THE DEFENDANT: I am not praying no jury trial.

(The prospective jurors were sworn on their voir dire.)"

Thereafter, the court conducted extensive voir dire, both sides moved to strike or excuse various prospective jurors, a jury was ultimately selected, and the jurors were sworn. Not another word was said about a court trial; at no time did either counsel or appellant express any dissatisfaction with the fact that the case would be tried by a jury. It is clear to us, notwithstanding appellant's ambiguous blurt, "I am not praying no jury trial," that, after discussion with his attorney, he elected a jury trial.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.

ROBERT M. BELL, Judge, dissenting.

Contrary to the majority opinion, reversal is not merely warranted in this case, it is required. In my opinion, the crux of this appeal involves the question whether appellant received the fair trial that the Maryland and federal Constitutions guarantee him. A fair reading of the entire transcript of the trial, not just that portion concerning Officer Brown, reveals that appellant did not, and, indeed, could not have, received a fair trial before this trial judge. I therefore dissent.

At bottom, the issue does involve, as the majority in part 3 of its opinion recognizes, the court's interjection of itself in the trial by substantial and frequent interventions in the questioning of witnesses.

To be sure, a trial judge may question witnesses. In doing so, however, the trial judge must stay within appropriate bounds. We addressed the limits of those bounds in two recent cases, *Cardin v. State*, 73 Md.App. 200, 533 A.2d 928 (1987) and *Smith v. State*, 66 Md.App. 603, 505 A.2d 564, *cert. denied*, 306 Md. 371, 509 A.2d 134 (1986). In each, we quoted, with approval, from *Bell v. State*, 48 Md.App. 669, 678, 429 A.2d 300 (1981):

The trial judge's role is that of an impartial arbitrator and that appearance is not generally compatible with an inqui-

sitorial role. It is the better practice for a trial judge to inject himself as little as possible in a jury case, *United States v. Green,* 429 F.2d 754, 760 (D.C.Cir.1970), because of the inordinate influence that may emanate from his position if jurors interpret his questions as indicative of his opinion. *See, also, Patterson [v. State,* 275 Md. 563, 578–80, 342 A.2d 660 (1975) ]. The appearance that a judge may have abandoned his role as an impartial arbitrator, is especially hazardous when cross-questioning a defendant.

Yet, if counsel have faltered in their advocacies, it is not improper for the trial judge to be "meticulously careful to make sure that the full facts [are] brought out", *Jeffries v. State,* 5 Md.App. 630, 632 [248 A.2d 807] (1959), or to seek to discover the truth when counsel have not elicited some material fact, or indeed when a witness has not testified with entire frankness. Annot., 84 A.L.R. 1172, 1193 (1933). Such questioning may even bear upon the credibility of a defendant in a proper circumstance. *Madison v. State,* 200 Md. 1, 12 [87 A.2d 593] (1952); *King v. State,* [14 Md.App. 385, 287 A.2d 52, *cert. denied,* 265 Md. 740 (1972) ] at 394 [287 A.2d 52]. This should be achieved expeditiously, however, if at all, for a protracted examination has a tendency to convey to a jury a judge's opinion as to facts or the credibility of witnesses.

*Cardin,* 73 Md.App. at 229–230, 533 A.2d 928; *Smith,* 66 Md.App. at 618–19, 505 A.2d 564.

The Court of Appeals has provided additional guidance. In *Vandegrift v. State,* 237 Md. 305, 311, 206 A.2d 250 (1965), the Court held that "[t]he questioning by the trial judge showing his disbelief of the witness' testimony [is] beyond the line of impartiality over which a judge must not step." There, the trial judge questioned the witness repeatedly on the same subject matter and reminded the witness that he was under oath and subject to penalty for perjury. *See also Marshall v. State,* 291 Md. 205, 213, 434 A.2d 555 (1981), in which the Court of Appeals stated:

... [A] judge presiding over a jury trial ... should exercise th[e] right [to interrogate witnesses to clarify issues] sparingly. It is a far more prudent practice for the judge to allow counsel to clear up disputed points on cross-examination, unassisted by the court. In this manner, the judge is most likely to preserve his [or her] role as an impartial arbiter, because he [or she] avoids the appearance of acting as an advocate.

The Court in *Brown v. State*, 220 Md. 29, 39, 150 A.2d 895 (1959), disapproved the questioning of a defendant by the trial judge in such a way as to "indicate sarcastically, so that the jury could not have failed to understand, that the judge did not believe [the story the defendant] was telling...."

The permissible bounds of interjection and inquiry thus appear to be clear. A trial judge should interject himself or herself as little as possible into the trial of the case, giving due opportunity for the advocates to present, in their own way, the facts in support of their cause. *See Marshall*, 291 Md. at 214, 434 A.2d 555. When the judge does interject himself or herself, it should be solely for the purpose of clarifying or sharpening issues or eliciting material facts which the advocates have not presented. The more protracted the examination of a witness, the more likely it is that the examination will convey to the jury the trial judge's opinion concerning the credibility of that witness.

Turning to the case *sub judice*, the majority has very considerately characterized the trial judge's actions in this case as stepping in "at several points to clarify questions posed by counsel or to give the witness an opportunity to explain or clarify the alleged inconsistencies." This characterization is not supported by the record. On the contrary, the record discloses that the trial judge, totally oblivious of any bounds, interjected herself repeatedly, into the proceeding. In fact, there were more than a hundred such instances. The judge participated, to some extent, in the questioning of each witness called to testify.

To be fair, some of the trial judge's interjections were innocuous and some were for the purpose of clarifying questions posed by counsel; the vast majority of them, however, were much more serious. A few examples are demonstrative. During the State's case, the court's interventions included participating freely and frequently in the direct examination of witnesses,[1] assisting the assistant State's Attorney in the presentation of his case,[2] when he did not wish help, and, indeed, resisted it;[3] interrupting cross-examination by defense counsel to assist State's witnesses in responding to questions;[4] and explaining the

----

1.  By way of example, the judge interrupted the direct examination of Mary Henderson and Cherome Hines, witnesses to the robbery, as well as Officers Brown and Wagner, on several occasions, and proceeded to conduct the questioning of those witnesses.

2.  During the State's examination of Officer Brown, the trial judge interrupted direct examination to direct the officer's attention to appellant for the purpose of identification. She also assisted the State by developing testimony concerning the time that elapsed between the officer seeing a gun and apprehending appellant. Similarly, while Officer Wagner was on the witness stand, the judge stated, "I think he can tell us what the description was", thus suggesting that the State ask Officer Wagner to relate the description of the robber given him by one of the witnesses. Other efforts to assist the State in similar ways occurred during the testimony of Hines and Barbara Means.
    In the case of Means, the judge, as she did during Brown's testimony, asked the witness to identify the robber, which, as the State reminded her, she had already done.

3.  When the judge reminded the State that it had not questioned Officer Brown about a "briefcase" which the police had recovered, the State had to point out to her that his concern at that time was what the officer observed at the scene and that the officer had not seen the "briefcase" at the scene. Also *see* the reference to Barbara Means in n. 3, *supra*.

4.  Examples of this can be found during the cross-examinations of Officers Brown, Garrity, and Wagner and of Mary Henderson. In the case of Officer Brown, the judge provided assistance on more than one occasion. On one occasion, after defense counsel had read from the officer's prior testimony, and before the officer had answered a question based on that prior testimony, the judge prompted:
    "If you previously testified that you had the coat when you went out of the building, would that be what happened, that you did have the coat?"
    On another, the court interrupted defense counsel to observe:

testimony of State's witnesses.[5] The trial judge also re-phrased questions, rather than ruling on objections by defense.[6] Moreover, in addition to correcting defense counsel in front of the jury and suggesting how questions should be phrased, the trial judge raised objections *sua sponte*.[7] During the defense case, the judge, without regard to, and in fact, in spite of, the defense strategy, cross-examined de-

---

"Ms Julian, he does not deny what he said before and I believe he said if you have a record saying he said it before, that's what he said. Is that right officer?"

The record does not reflect that the officer said any such thing.

5.   In addition to explaining testimony given by Officer Brown, the trial judge also interpreted the testimony of Officer Wagner.

6.   A good example of this occurred during the State's direct examination of Hines. Although appellant's counsel objected to the question, "Were you able to see anything about this individual although you couldn't see his facial features?", the judge never ruled on the objection. Instead, she instructed the witness:

"You can tell us what you can tell us about what he was wearing, what he looked like insofar as you were able to see him. She already said ...

Tell us everything you can remember of what you were able to observe of him."

Other examples occurred during the testimony of Officer Brown and Mary Henderson.

7.   During the cross-examination of Officer Brown, the following colloquy occurred:

[by defense counsel] You also reported that Mrs. Henderson stated that she saw the suspect go into 4608 Manordene and exit a short time later after the actual robbery wearing a light windbreaker carrying a black duffel bag and then run North through the complex of—

The Court: This is all hearsay. This is something she told somebody else?

. The Witness [Off. Brown]: This was told Officer Garrity.

Mr. Townsend [Prosecutor]: I have had a continuing objection to this.

The Court: I sustain.

The record does not reflect that a continuing objection had been granted the prosecutor. Later, the court sustained an objection which was never made. Although defense counsel pointed this out to her, the judge did not respond.

fense witnesses during their direct examination.[8] In some instances, the trial judge anticipated issues which had not yet been raised and, in at least one other, questioned a witness concerning his testimony in a prior trial.[9]

Throughout trial, the trial judge asked questions repetitious of testimony already given by the witness, thus emphasizing that testimony for the jury.

Specific reference to the trial judge's actions during the testimony of appellant and Wheatley further demonstrates the egregiousness of the judge's conduct. The judge interrupted appellant's direct examination to question appellant or make observations on seven occasions. On the first, the judge referring to appellant's reference to a Kuti, asked, "You mean a muslim type thing?[10] The next three interruptions were for the purpose of asking questions that rehashed testimony previously given by appellant, thereby emphasizing it to the jury. During cross-examination, the judge interrupted the prosecutor to question appellant about using other names. In addition, when appellant began to respond broadly to a broad question asked by the prosecutor, the judge instructed him to "just answer the question", and immediately thereafter interpreted his explanation as: "You mean that he [a police officer] lied." The judge's participation in redirect examination continued to be frequent and active.

---

**8.** In addition to appellant, the trial judge cross-examined appellant's brother (concerning the distance from Westside Skill Center, where appellant testified he was going, to 904 West Lexington Street, where appellant lived), his mother (concerning the relationship between appellant and a defense witness), L. Leurs, an investigator for the public defender, and Delano A. Wheatley, the defense witness who claimed to have seen the robber, whom he testified was not appellant.

**9.** This occurred during the cross-examination of Leurs.

**10.** This is significant because Henderson had testified that appellant was wearing a "muslim type of head covering" after he had changed clothes and because the judge did not await the completion of direct examination to begin her questioning.

The trial judge's interjections during the testimony of Wheatley were more serious. Demonstration of the correctness of this assertion is perhaps best achieved by quoting pertinent excerpts directly from the record, as appropriate. The trial judge's first interruption came early in the direct examination of Wheatley and it was for the purpose of asking the witness what time he had first seen appellant. The next interruption occurred as follows:

Q. (By appellant's counsel) Let me ask a general question. Under what circumstances did you see Mr. Ferrell that day?

A. I had noticed Mr. Ferrell being arrested as I was leaving my girlfriend's house one morning. That's how I remember his face. Right now I am presently incarcerated and I had noticed Mr. Ferrell at the jail where I am being detained and I had remembered his face from being arrested.

Q. Had you noticed anything unusual before you noticed the arrest?

A. Yes, ma'am, I did. Early in the morning I noticed a guy running by me removing a mask from his head.

The Court: You say you were staying at your girlfriend's house?

The Witness: Yes, I was there the night before.

The Court: Where does she live?

The Witness: On Swan. Upland Apartments.

The next significant interruption occurred after Wheatly had testified concerning the complexion and weight of the robber. At that time the court interrupted to ask "What do you consider yourself to be?", to which the witness replied, "Well, I'm dark or medium dark I suppose." When the focus of the examination turned to Wheatley's observations of appellant's arrest, the following occurred:

Q. (By appellant's counsel) Now, did there come a time where you saw the arrest? That's what you've testified, correct?

A. Yes, ma'am. I had noticed Mr. Ferrell being arrested after I had left my girlfriend's house about twenty, thirty minutes later and—

The Court: Twenty or thirty minutes had gone by since you saw the man with the—taking off the mask?

The Witness: About. Yes, ma'am. I got the cigarettes, went back to my girlfriend's house and had breakfast. In that amount of time, maybe thirty minutes is when I left for good at which time I came out. This is when I noticed Mr. Ferrell.

The Court: Being arrested.

The Witness: Yes, ma'am. That's correct.

The Court: You had never seen him before that day?

The Witness: No, ma'am, I had not.

Similar interruptions occurred during Wheatley's cross-examination. After the prosecutor had explored the circumstances under which Wheatley had seen appellant being arrested and had begun to develop the facts from which it could be determined whether Wheatley's identification was reliable, perhaps the most significant interjection on the part of the trial judge occurred:

Q. (By the prosecutor) Then you went into your girlfriend's house, stayed twenty or thirty minutes and then when you came out you saw the defendant whom you now recognize. You didn't know him at the time.

A. No, sir, I did not.

Q. And you haven't seen him for the past twenty months until very recently.

A. That's correct.

Q. I believe you told us very candidly you just met him during your recent incarceration.

A. Yes, sir. I noticed him, you know. He is housed in the same section of the jail.

The Court: How much of a look at him did you get that day when you saw him being arrested?

The Witness: Pretty good. I stopped and signified.

The Court: Did you stop and watch what was happening?

The Witness: Yes, ma'am. Him being arrested. I stopped and watched.

The Court: What all did you see?

The Witness: The average arrest procedures.

The Court: Tell us.

The Witness: His hands being cuffed behind his back and put into the—into the, you know, truck like thing.

The Court: Did you see anybody else there besides police?

The Witness: No, just police, ma'am. Just police.

Q. (By prosecutor) You don't recall seeing a number of ladies of all ranges in age relatively old to quite young?

A. No, sir. I couldn't actually say.

The Court: How was he dressed?

The Witness: I can't remember as a matter of fact, ma'am, his exact clothing.

The Court: Well, the next time you saw him was twenty months later?

The Witness: Yes, ma'am. About.

The Court: But you remembered his face?

The Witness: Yes, ma'am, I did. As a matter of fact, the shape of his head I remember.

While it is true that we do not have the benefit of having heard and seen the witnesses testify live, several things are obvious from the examination of Wheatley by the trial judge. First, the trial judge did not wait for the advocates to do their job before plunging in and asking questions. Second, the questions the trial judge asked were those affecting the credibility of the witness. Third, and most important, given the nature of the questions the trial judge asked and the context in which they were asked, "the jury could not have failed to understand, that the trial judge did not believe the story [the witness] was telling...."

As I read the transcript, it is clear that the trial judge was not an impartial arbitrator, but an advocate for the State.

The majority acknowledges that some of the trial judge's interventions were "wholly unnecessary and served only to provoke an argument with defense counsel", that "the court should certainly have exercised greater restraint", and further, that this Court has previously admonished the trial judge for past indiscretions of this kind. *See McMillian v. State*, 65 Md.App. 21, 499 A.2d 192 (1985). Nevertheless, the majority holds that the judge's interruptions and comments were not tantamount to reversible error. It observes in passing that many of the *sua sponte* interjections and comments were not "immediately objected to",[11] which seems to suggest that had there been objections, the result might have been different. I can concur with the majority only insofar as it acknowledges error on the part of the trial court. As indicated, I consider the error to mandate reversal. In that regard, I call to the majority's attention the case of *Elmer v. State*, 239 Md. 1, 9, 209 A.2d 776 (1965) in which the Court of Appeals, commenting upon the trial judge's declaration, in front of a jury, that a witness was hostile, held:

> We think under the unusual circumstances here presented and the unquestionably harmful effects of the judge's remarks in the presence of the jury as we point out in more detail below, the accused was not afforded a fair and impartial trial and he was, therefore, denied due process of law, which, under the authorities cited above, would call for our review of the propriety of the court's remarks, even if no objection had been made thereto.

The authorities cited by the Court included *Bryant v. State*, 207 Md. 565, 115 A.2d 502 (1955); *Wolfe v. State*, 218 Md. 449, 146 A.2d 856 (1958) and *Rowe v. State*, 234 Md. 295, 199 A.2d 785 (1964).

---

**11.** Appellant's counsel did object on one occasion to the court's interruptions and moved for mistrial. In the colloquy that followed, the trial judge declared: "I only interrupt when the questions are improper."

In *Bryant,* although holding that the record did not show that the trial judge's actions deprived the accused of a fair and impartial trial, the Court commented that: "[t]he degree of severity of the trial judge's rebukes of an attorney, when the occasions require them, is left to the discretion of a judge 'as long as they do not prevent a fair and impartial trial'". 207 Md. at 585, 115 A.2d 502. Similarly in *Wolfe,* in which a trial judge, attempting to assist an unrepresented defendant, made prejudicial remarks in the presence of the jury, the Court of Appeals, on its own motion, took "cognizance of and correct[ed] the ... error even though such error may not have been properly includable in the assignment of errors...." 218 Md. at 455, 146 A.2d 856. The Court reiterated the general rule, however, that generally an issue may not be raised on appeal unless preserved by appropriate objection. Rather than improper remarks by the trial judge, *Rowe* involved, the effect of the court's failure to instruct the jury as to a finding of insanity. Even though no assignment of error was made as to that issue, the Court stated, "we think we must, under the unusual circumstances of this case, take cognizance of the plain error *sua sponte."* 234 Md. at 302, 199 A.2d 785.

I also remind the majority that at issue here is whether we should exercise our discretion to review an issue which was not raised and decided below. Maryland Rule 1085 contemplates that an appellate court "will not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the lower court." Its prohibition, however, is not absolute, as evidenced by the "use of the adverb 'ordinarily' [which] implies that there may be extraordinary circumstances in which review will be granted despite the lack of a ruling at the trial level." *Smith v. State,* 64 Md.App. 625, 632, 498 A.2d 284 (1985). As this Court observed in *Smith,* "In the final analysis, the question of whether to review an issue not raised and decided below is discretionary with the appellate court." 64 Md.App. at 632, 498 A.2d 284, citing *Booth v. State,* 62 Md.App. 26, 38, 488 A.2d 195 (1985). Moreover,

like the exercise of discretion to notice plain error, ". . . this discretion should be exercised in favor of review when the 'unobjected to error [is] compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial' ". 64 Md.App. at 32, 498 A.2d 284, quoting *State v. Hutchinson*, 287 Md. 198, 203, 411 A.2d 1035 (1980). It cannot be gainsaid that the error in this case easily meets each of those criteria.

Thus, it is plain that "when the trial result[s] in a denial of due process", *Elmer*, 239 Md. at 8, 209 A.2d 776, the Court should review the propriety of the actions of the trial court *sua sponte* or, at the very least, at the suggestion of appellant, even if that suggestion is presented for the first time on appeal.

To the majority's suggestion that under these circumstances, simply an admonition is sufficient, the following should be noted. An admonition has not worked in the case of this trial judge in the past and, furthermore, an admonition will not ameliorate the adverse effects suffered by appellant as the result of the trial judge's actions. It is my view that the failure to take definitive action in this case effects a travesty of justice and undermines the very principles of due process contained in the federal and Maryland Constitutions.

Because the trial judge's interjections in the trial denied appellant a fair trial and due process of law, I would reverse appellant's convictions and remand the case for a new trial. Moreover, I would instruct that the new trial be conducted before another judge.

I also have a problem with the majority's resolution of appellant's double jeopardy/collateral estoppel issues. I agree with appellant's "simple and direct" position: "[T]he use of a deadly weapon is a necessary element for conviction under Article 27, Section 488. Here the Appellant was found not guilty of the use of the handgun in the third trial. The only State theory of the case was that a handgun was involved." Although appellant admittedly did not provide us with a transcript of the third trial, that appellant's

premise is correct is obvious and is not seriously contested. Mere conjecture, which is the only stuff of which the State's position is made, does not suffice to sustain the majority's holding. This is particularly so where, as here, neither the State nor the trial judge, during the argument on appellant's motion to dismiss, disputed, or even suggested, that the State's theory of the case was that appellant acted in concert with someone else, or that the evidence tended to prove such a theory. All the State posits is, as the majority acknowledges, the conjecture that "the third jury may have concluded that appellant was not the actual robber (or wielder of the handgun) but may have entertained some feeling, short of unanimity, that he was an accomplice of or receiver for the actual robber, who escaped."

I also have difficulty with the majority's position with regard to the election of a jury trial issue. At the conclusion of the colloquy with the court concerning his election, appellant specifically stated, in what I consider to be unambiguous terms, that "I am not praying no jury trial." The court did not respond to that statement or conduct any inquiry with respect to it. I think that, at the very least, there should have been some inquiry made by the trial court to ensure that appellant's election was freely and voluntarily made. Since that was not done, I believe that the case should be reversed for that reason as well.