957 A.2d 1139

**Antwan Derrell SMITH**

v.

**STATE of Maryland.**

**No. 614, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Oct. 6, 2008.

446

448

Paul A. Solomon, Washington, DC, for Appellant.

James E. Williams (Douglas F. Gansler, Atty. Gen., on brief), for Appellee.

Panel: DAVIS, DEBORAH S. EYLER and JAMES A. KENNEY, III (retired, specially assigned), JJ.

DAVIS, J.

Appellant, Antwan Derrell Smith, and his co-defendant, Charles Patterson, were tried by a jury in the Circuit Court for Baltimore City from March 13–21, 2007, on various counts of first-degree murder, armed robbery, robbery, conspiracy to commit robbery and assault. On March 21, 2007, the jury convicted appellant of three counts each of armed robbery, robbery and second-degree assault and one count each of

attempted armed robbery and attempted robbery.[1] On May 3, 2007, the circuit court denied appellant's motion for new trial. On that same day, the circuit court merged the assault, robbery and attempted robbery counts into the armed robbery and attempted armed robbery counts and imposed a sentence of (1) twenty years imprisonment on one count of armed robbery; (2) ten years imprisonment on another count of armed robbery (consecutive to the first sentence for armed robbery), (3) ten years imprisonment on a third count of armed robbery (concurrent with the second sentence for armed robbery), and (4) ten years imprisonment on the final count of attempted armed robbery, to be served concurrently with the second sentence for armed robbery.

From these convictions and sentences, appellant filed the instant appeal, presenting the following questions, which we have rephrased as follows:

1. Did the trial court err when it denied appellant's motion to suppress evidence on the grounds that the initial traffic stop of the car in which appellant was a passenger was valid under the Fourth Amendment to the United States Constitution?

2. Did the trial court abuse its discretion when it repeatedly questioned State's witnesses during appellant's trial, thus depriving appellant of his right to a fair and impartial trial?

3. Did the trial court err by admitting an exhibit proffered by appellant's co-defendant, later given to the jury during its deliberations, that, unbeknownst to the court and counsel, contained evidence of appellant's possession of a controlled dangerous substance that was earlier deemed inadmissible by the trial court?

---

1. At the close of the State's case-in-chief, the trial court granted appellant's motion for judgment of acquittal as to one count of first-degree premeditated murder. On March 21, 2007, the trial court also declared a mistrial as to the conspiracy counts, given the lack of juror unanimity. The jury acquitted appellant of felony murder, second-degree murder, voluntary manslaughter and four counts of first-degree assault.

For the reasons that follow, we answer question I in the negative and question II in the affirmative. In light of our disposition of question II, we decline to reach question III. Accordingly, we shall reverse the judgment of the Circuit Court for Baltimore City.

## FACTUAL BACKGROUND

Appellant was arrested after Baltimore City police officers initiated a traffic stop of a car driven by appellant's co-defendant, Charles Patterson. Appellant and Patterson were jointly tried on various charges related to the murder of Anthony Hecht[2] and the robbery of James Anderson, Charlotte Johnson, Tycara Johnson and Lamar Davis, all of which occurred, according to the State, prior to the traffic stop that resulted in the arrests of appellant and Patterson.

At appellant's trial, James Anderson, also known as "Liquor Boy" and "Gasoline," testified that, sometime during the late evening of October 23, 2005 or into the early morning hours of October 24, 2005, he asked a man standing on the corner if he would help Anderson procure cocaine. Both men walked around to the back of a building, where another man approached Anderson and demanded money from him at gunpoint. Both before and during trial, Anderson identified Patterson as the man standing on the corner and appellant as the man with the gun. Patterson took $5 out of Anderson's pocket. Anderson then accompanied both Patterson and appellant to the front of the building, where Anderson noticed three people sitting on a front stoop.

According to the testimony of Charlotte Johnson, Davis and Tycara Johnson, sometime before midnight on October 23, 2005 and/or during the early morning hours of October 24, 2005, three men approached them while they were sitting on Charlotte Johnson's front porch at 4105 Cleve Court in the Brooklyn area of South Baltimore. One of these men carried what Charlotte Johnson described as a "long silver like rifle."

---

2. As noted, appellant was acquitted of the murder charges.

The man with the rifle demanded that she and her companions empty their pockets and lay down on the ground. Additionally, Davis recognized one of the three men as a person he knew by the nickname "Gasoline." After removing a ten-dollar bill, a pack of cigarettes and a lighter from her pockets, Charlotte Johnson lay down on the porch and covered her head with a coat. Davis testified that he removed a book of matches from his pocket and lay down on top of Charlotte Johnson. The robbers also took $80 from Tycara Johnson after she removed the money from her pockets.

At appellant's trial, the State argued that, during or shortly after these robberies, the murder victim, Anthony Hecht, opened fire on appellant and Patterson, who fired back, killing Hecht. Hecht's body, cartridge casings and bullets were later recovered from the area. Charlotte Johnson, Tycara Johnson and Davis all testified that, after laying down on the porch, they heard the sound of gunfire. Anderson also lay down on the ground, but only after hearing gunshots. None of the four victims witnessed the gunfire or the shooting. Detective Charles Bealefeld, who participated in the investigation of Hecht's murder, testified that the first report of gunshots in the area was at 11:25 p.m.

Additionally, at trial, neither Charlotte Johnson, Tycara Johnson, nor Davis identified Patterson or appellant and all three admitted that they did not see who committed the robbery. Although Detective Bealefeld testified that Charlotte Johnson previously identified appellant and Patterson in a pretrial photographic line-up, Johnson expressly denied having made an identification.

Chris Kornish,[3] a friend of appellant and Patterson, testified that, on the night of October 23, 2005, he was a passenger in a BMW driven by Patterson. That evening, Patterson stopped somewhere in South Baltimore, exiting the car with appellant and leaving Kornish seated in the car. A short while later,

---

**3.** Although Kornish's first and last name are spelled with a "C" or a "K" throughout the trial transcript, for sake of clarity, this Court will use the spelling "Chris Kornish."

Kornish heard three gunshots. When Patterson and appellant returned to the car, Kornish noticed that appellant was carrying a black and silver rifle. Appellant told Kornish that somebody had been shooting at appellant. Kornish testified that they then went to a bar and were stopped by police officers on their way home from the bar. Detective Bealefeld testified that Kornish identified both appellant and Patterson out of a photo array as the individuals he was with the night they were arrested.

Officer Creinton Goodwin and Officer Charles Watkins testified that they initiated a traffic stop of a silver BMW at approximately 11:50 p.m. upon determining that the BMW was traveling at a high rate of speed. Patterson was driving the car and appellant and Kornish were seated in the front and back seats, respectively. After stopping the car, Officer Watkins approached the passenger side of the car and immediately noticed that appellant appeared to be hiding a gun under his legs. Officer Watkins seized the gun, later determined to be a High Point .9 mm assault rifle and the occupants of the car were placed under arrest.

Both appellant and Patterson moved to suppress evidence seized subsequent to the traffic stop. Their motions to suppress were denied by the circuit court on March 5, 2007. The rifle was admitted as evidence at trial and a firearms identification expert testified that cartridge casings recovered from the crime scene matched the rifle retrieved from Patterson's car.

Additional facts will be provided as warranted in our analysis, *infra.*

## ANALYSIS

### I

Appellant and his co-defendant, Patterson, filed a motion to suppress evidence, challenging the legality of Officer Goodwin's traffic stop. The circuit court denied their motion to suppress on March 5, 2007, ruling that Officer Goodwin's

traffic stop was valid under the Fourth Amendment. Appellant assigns error in the circuit court's conclusion.

## A. Standard of Review

 Our review of the circuit court's denial of a motion to suppress is based on the record created at the suppression hearing and is a mixed question of law and fact. *See Whiting v. State,* 389 Md. 334, 345, 885 A.2d 785 (2005). An appellate court reviews the trial court's findings of fact only for clear error, giving due weight to the inferences fairly drawn by the trial court and viewing the evidence and inferences reasonably drawn therefrom in a light most favorable to the prevailing party on the motion. *Id., State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439 (2003). However, legal conclusions are not afforded deference and thus are reviewed *de novo. Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491 (1999); *see also Ornelas v. United States,* 517 U.S. 690, 698–99, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). This Court reviews *de novo* the conclusions of the trial court as to whether reasonable, articulable suspicion justified a traffic stop, as this is a question of law.

## B. Investigatory Stop of Patterson's Car

At the suppression hearing, Officer Goodwin testified that, at approximately 11:50 p.m. on October 23, 2005, he and three other officers were sitting in a marked patrol car facing westbound on Mosher Street at the intersection with Gilmore Street. At that time, Officer Goodwin noticed a silver BMW heading northbound on Gilmore Street at what he believed to be a "high rate of speed," later clarifying that he estimated the speed to be approximately forty to forty-five miles-per-hour. He further testified that the posted speed limit in the area was twenty-five miles per hour and conceded that he did not use radar to detect the speed at which the car was traveling. Officer Goodwin immediately turned right onto Gilmore Street and activated his emergency lights, initiating a traffic stop of the car. Once stopped, Officer Goodwin approached the driver's side of the car, where Patterson was seated, while Officer Watkins approached the passenger side

of the car, where appellant was seated. Each officer was accompanied by another officer. Officer Watkins eventually spotted and retrieved a firearm from the car and all three occupants of the car were arrested.

Instead of issuing a traffic citation to Patterson for exceeding the maximum speed limit, Officer Goodwin issued a citation for driving at a speed greater than reasonable under the conditions. Officer Goodwin testified that he believed the speed of the car was unreasonable because it exceeded the posted speed limit and pedestrians were in the neighborhood at the time. Officer Goodwin conceded that the only other time that he had issued a traffic citation for speeding based on visual observation alone, *i.e.*, without the help of radar, was approximately four or five years earlier when he was in training.

At the suppression hearing, counsel for appellant's co-defendant, Patterson, made the following comments during his argument:

Even if it was the speed limit of 25 miles per hour, he simply suggests—the officer says, well, it was about 40 to 45 miles per hour. Yet that is not, in fact, what he gave Mr. Patterson a ticket for. He gave Mr. Patterson a ticket for speed greater than reasonable. And he tried to create—as the court watched him on the stand kind of waffle back and forth—to create something to suggest that there was a basis for making the stop on this vehicle for speed greater than reasonable.

Today is the first time you've heard anything—there's no police report that he has authored to offer to suggest that this was a stop based on one going 40 to 45 miles an hour, but rather this has been alleged to be a basis for the stop, the purpose of the ticket, the ticket says that it was speed greater than reasonable.

Now before you today—and the credibility has come into question, Your Honor—while they cannot show that this was speed greater than reasonable because it doesn't come close, there's no evidence here that there was—even if it

was 40 miles an hour, 45 miles an hour, at 11:50 p.m., on a roadway.

There's, in fact, no description of the neighborhood that would suggest that at the time—based on this neighborhood, based on the conditions of the roadway—that the speed was greater than reasonable for the conditions that surrounded Mr. Patterson at the time that he allegedly was driving 40 to 45 miles an hour.

\*　　\*　　\*

I think, Your Honor, that this is clearly a situation where the officers saw what they saw—they saw three men in a vehicle, three African American men in a vehicle, and they chose to stop this car because it was a BMW traveling this roadway and they decided to stop it.

After Patterson concluded his argument, appellant's counsel argued as follows:

Your Honor, *just expanding on [co-defendant's counsel's] argument,* he also testified that he hadn't done any type of a stop of this kind in the four or five years since training. That he'd never done one on his own. He'd been trained in this, but never utilized that training.

He did not know what the street immediately—the cross street immediately to his south was and whether or not it was controlled by any type of a device that would cause the car to stop.

He did not know what the street was immediately to his north. There was subsequent testimony by the second officer that it was, in fact, Riggs, which is a four-way stop. He was unable to articulate whether or not the BMW vehicle stopped at Riggs. That, in and of itself—his inability to remember and articulate what took place at the intersection at Riggs, I think the court can see that this is not a pretextural [sic] stop. *That the pretext, so to speak, was manufactured, as [co-Defendant's counsel] indicated,*

*after the search had taken place.* And the entire vehicle stop should be suppressed, Your Honor.

(Emphasis added.)

In denying their motions, the circuit court ruled, in pertinent part, as follows:

Motion to suppress is denied. The officer in this particular case saw a violation of the transportation code. *Much has been made by both Defense counsel of his information was inadequate, but I think both focused too searchingly on the narrow issue of did he have enough information upon initially seeing the car and observing the alleged violation,* because he testified at that point he turns the corner, follows the car, and has to get up to 40 in order to catch up with the car.

*So I think there's clearly a speeding violation. He corroborates that by issuing a speeding ticket. It's of no moment to me whether he does speed greater than reasonable or puts a specific speed down.* And I'm not sure what experience he had in terms of District Court that caused him to do it that way. But I don't think I have to speculate about that. *We don't have a pretextural [sic] violation here. We don't have a Rowe situation where you're essentially taking ambiguous behavior and trying to turn it into a transportation code violation.*

Speed is speed. Officers have the capacity to estimate speed. This officer had the capacity. He verified that by how fast he had to go in order to catch up with the vehicle. And I find nothing wrong with the stop of the vehicle.[4]

(Emphasis added.)

Appellant argues that this conclusion by the circuit court was erroneous, as Officer Goodwin stopped the car, according

---

4. The circuit court did not articulate whether the officer had reasonable, articulable suspicion or probable cause to believe that Mr. Patterson violated the traffic code by speeding, finding generally that the traffic stop was valid under the Fourth Amendment. During its suppression hearing argument, however, the State argued that the officers validly stopped the car based on reasonable, articulable suspicion under

to appellant, only because he saw "three young African—American males driving together in a BMW late at night in West Baltimore." He urges this Court to restrict its review of the constitutional validity of the traffic stop to "those factors identified in the four corners of a contemporaneously prepared traffic citation or charging document issued to the driver or in a charging document or affidavit for the arrest of an occupant of the vehicle." Appellant notes that, although Officer Goodwin testified that he stopped the car because he believed the driver exceeded the established speed limit, which constitutes a violation of Md.Code Ann., Transp. II § 21–801.1 (2006 Repl.Vol.), Officer Goodwin ultimately issued a traffic citation for driving at a speed greater than reasonable under conditions, which constitutes a violation of Md.Code. Ann., Transp. II § 21–801(a) (2006 Repl.Vol.). Noting that this Court has previously held that evidence of excessive speed alone is insufficient to support a *conviction* for driving at a speed greater than reasonable under the conditions, *see Warren v. State,* 164 Md.App. 153, 882 A.2d 934 (2005), appellant posits that an officer's observations as to excessive speed alone should also be insufficient to form the factual basis for a *Fourth Amendment traffic stop,* if the rationale for the stop is excessive speed but the traffic citation that is ultimately issued is for driving at a speed greater than reasonable under the conditions.[5]

The State counters that appellant failed to preserve appellate review of his claim, arguing that appellant did not question either Officer Goodwin or Officer Watkins about their observations regarding the race of the occupants of the car and did not argue this issue before the circuit court. Even if

*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and subsequent Maryland cases.

**5.** Appellant, citing to cases from the U.S. Court of Appeals for the Tenth Circuit, also argues that "an officer's failure to understand the language of a statute he is charged with enforcing is not objectively reasonable." As this argument was raised for the first time in appellant's reply brief, we will not consider it. *See Robinson v. State,* 404 Md. 208, 216 n. 3, 946 A.2d 456 (2008).

preserved, the State posits that the relevant inquiry is whether, at the initial investigatory stage, Officer Goodwin had reasonable articulable suspicion of criminal activity, authorizing him to initiate a traffic stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny. It reasons that the inability of the State, under these facts and in light of *Warren, supra*, to convict Patterson for driving at a speed greater than reasonable under the conditions is irrelevant because the quantum of proof necessary to establish reasonable articulable suspicion is less than proof beyond a reasonable doubt. The State maintains that the inquiry must be based on an analysis of the "totality of the circumstances," and cannot be restricted, as appellant suggests, to the "four corners" of the traffic citation. The State argues that, under a totality of the circumstances, Officer Goodwin's observations as to the car's excessive speed did in fact justify the *Terry* stop in this case.

We hold that appellant properly preserved, for our review, his Fourth Amendment challenge to the traffic stop by Officer Goodwin. We nonetheless affirm the circuit court's finding that Officer Goodwin's traffic stop was valid under the Fourth Amendment, based on reasonable articulable suspicion that the driver of the car was violating Maryland's traffic code by driving over the speed limit.

### C. Preservation

As a general rule, this Court will not decide any issue unless it plainly appears by the record to have been raised in or decided by the court below. Md. Rule 8–131(a). Accordingly, the failure to argue a particular theory at a suppression hearing waives the ability to argue that theory on appeal. *See Stone v. State*, 178 Md.App. 428, 445, 941 A.2d 1238 (2008); *Brashear v. State*, 90 Md.App. 709, 720, 603 A.2d 901 (1992).

At the suppression hearing, Patterson's counsel articulated the argument appellant now raises, noting that the traffic citation only charged Patterson with driving at a speed greater than reasonable under the conditions, challenging Officer

Goodwin's justification for the traffic stop and concluding that Officer Goodwin only stopped the car because he noticed that its occupants were African–American. Immediately following the argument of Patterson's counsel, appellant's counsel informed the circuit court that he was "expanding" on his co-defendant's argument. He went on to argue that Officer Goodwin manufactured a basis for the traffic stop "as [co-defendant's counsel] indicated, after the search had taken place." These comments demonstrate that appellant's counsel intended to incorporate for the record the argument articulated by co-defendant's counsel. *C.f. Erman v. State*, 49 Md. App. 605, 612, 434 A.2d 1030 (1981) (holding that the defendant who neither moved for severance and mistrial *nor joined in his co-defendant's motion* waived right to raise issue on appeal) (emphasis added); *Hensen v. State*, 133 Md.App. 156, 165, 754 A.2d 1055 (2000). Indeed, the circuit court addressed both appellant and his co-defendant when it denied the motion to suppress on grounds that appellant now raises before this Court.

While it is preferable for trial counsel not to assume preservation by merely "tacking on" to a co-defendant's argument, the record of the suppression hearing, *sub judice*, reflects that appellant preserved for our review the Fourth Amendment issue he now raises on appeal.

## D. Reasonable Articulable Suspicion

 The Fourth Amendment prohibits unreasonable governmental searches and seizures. *See United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). The linchpin of the Fourth Amendment is reasonableness, which is determined "by balancing the intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests." *Hardy v. State*, 121 Md. App. 345, 354, 709 A.2d 168 (1998) (quoting *McMillian v. State*, 325 Md. 272, 281, 600 A.2d 430 (1992)) (internal citations omitted).

Warrantless searches, seizures and arrests are *per se* unreasonable, subject only to a few well established exceptions. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). It is well established that a valid traffic stop, or *Terry* stop, involving a motorist and/or passengers is one such exception. *See Terry,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Brendlin v. California,* 551 U.S. ——, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007); *Swift v. State,* 393 Md. 139, 899 A.2d 867 (2006); *Rowe v. State,* 363 Md. 424, 769 A.2d 879 (2001); *Ferris,* 355 Md. 356, 735 A.2d 491.

A police officer conducting a traffic stop makes a valid, Fourth Amendment intrusion if the officer has probable cause to believe that the driver has committed a traffic violation, *see Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), or if the officer has reasonable articulable suspicion that criminal activity may be afoot, including reasonable articulable suspicion to believe the "car is being driven contrary to the laws governing the operation of motor vehicles...." *Lewis v. State,* 398 Md. 349, 362, 920 A.2d 1080 (2007) (quoting *Delaware v. Prouse,* 440 U.S. 648, 650, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)); *see also Rowe,* 363 Md. at 433, 769 A.2d 879. An officer cannot rely on an inchoate or unparticularized suspicion or hunch to form the basis for a valid *Terry* stop. *Cartnail v. State,* 359 Md. 272, 286–87, 753 A.2d 519 (2000)(quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)).

Based on our *de novo* review of the suppression record *sub judice,* we affirm the trial court's ruling that Officer Goodwin had reasonable articulable suspicion to conduct a *Terry* stop of the car driven by Patterson. Officer Goodwin testified that, while he was stopped in his car and waiting to cross an intersection, he turned to his left and saw a silver BMW driving at what he estimated to be forty to forty-five miles-per-hour. He further testified that the posted speed limit in the area was twenty-five miles-per-hour. A

police officer is permitted to express a non-expert opinion as to the basis for his or her reasonable articulable suspicion. *See Matoumba v. State,* 390 Md. 544, 554, 890 A.2d 288 (2006). Moreover, an experienced, licensed operator of a car can express an opinion regarding the apparent speed of another car. *See Boyd v. State,* 22 Md.App. 539, 547–48, 323 A.2d 684 (1974). The motions court found Officer Goodwin's estimation of the speed of the car to be credible and corroborated by his testimony regarding how fast he had to travel in order to catch up with the car. We accord deference to the circuit court's assessment of Officer Goodwin's credibility and its subsequent findings of fact. The court's findings were not clearly erroneous. Moreover, the circuit court's legal determination that the traffic stop was based on reasonable articulable suspicion did not constitute error.

### E. Application of "Four Corners Rule" to Traffic Stops

As explained, Officer Goodwin articulated specific facts in support of his reasonable suspicion that Patterson was engaged, or about to engage in criminal conduct, as driving in excess of the posted speed limit is clearly a violation of Maryland's traffic code. *See* Md.Code Ann., Transp. II § 21–801.1 (2006 Repl.Vol.). This authorized Officer Goodwin to effectuate a limited intrusion into the Fourth Amendment rights of the driver and occupants of the car for the purpose of confirming or dispelling his suspicions.

We make this determination based on our assessment of the "totality of the circumstances" leading up to the traffic stop, *Sokolow,* 490 U.S. at 8, 109 S.Ct. 1581; we have not limited our review to the "four corners" of the traffic citation issued by Officer Goodwin, as appellant urges us to do.

In *Greenstreet v. State,* 392 Md. 652, 898 A.2d 961 (2006), the Court of Appeals explained the "four corners" rule, which confines appellate review of a judge's basis to conclude that issuance of a warrant is supported by probable cause to the "four corners" of the warrant and its accompanying documents. Appellant would have us extend the application of that

rule to our review of the validity of traffic stops and asks that we discount, as a matter of law, any testimony from an officer that supplements or is inconsistent with the words on a traffic citation.

We find *Greenstreet* to be inapposite here. The reason for requiring a "four corners" rule in the context of warrant issuance is to assess the issuing judge's probable cause determination *at the time the warrant is issued,* in light of "all of the circumstances set forth in the affidavit...." *Greenstreet,* 392 Md. at 667–68, 898 A.2d 961; *see also Valdez v. State,* 300 Md. 160, 168–69, 476 A.2d 1162 (1984) (allowing the consideration of evidence that "aids in deciphering what is within the four corners of the affidavit itself"). In determining the reasonableness of a *Terry* stop, however, we are required to look at the officer's observations and conduct *at the time the stop is initiated. See In re David S.,* 367 Md. 523, 532, 789 A.2d 607 (2002) (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. 1868, and noting that the reasonableness of a stop is determined by a dual inquiry, looking at "[w]hether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place"). An officer's decision to issue a traffic citation and his or her choice of crimes to charge in that citation may often be based on circumstances occurring after the officer's initial decision to conduct a *Terry* stop. The contents of a citation are, of course, relevant under the "totality of the circumstances" test. They are not, however, determinative.

Ultimately, a "totality of the circumstances" test cautions against "pars[ing] out each individual circumstance for separate consideration." *Ransome v. State,* 373 Md. 99, 104, 816 A.2d 901 (2003) (internal citations omitted). By adopting a bright-line rule restricting judicial review of a traffic stop to those factors identified within the four corners of a traffic citation, both the State and the Defense would be substantially less able to highlight an officer's pre-citation observations or conduct, which experience has shown us to be both probative

and relevant in making the case for or against the validity of a traffic stop. We decline to announce such a rule.[6]

### F. Application of *Warren v. State*

We need not determine whether the same facts justifying Officer Goodwin's traffic stop would also support a conviction for the crime charged in the citation. We are not sure why Officer Goodwin failed to charge Patterson with violating § 21–801.1 of Maryland's Transportation Code, which prohibits driving at a speed exceeding the posted limit. To be sure,

---

**6.** Appellant notes that "[a]t least one other jurisdiction faced with similar circumstances recently adopted such a standard with respect to its review of traffic stops," and urges us to follow the holding in *McDonald v. State*, 947 A.2d 1073 (Del.2008). In *McDonald*, an officer stopped a car for failing to activate a turn signal when exiting a parking lot. *Id.* at 1075. Based on events following the traffic stop, the defendant was arrested. *Id.* at 1075–76. After the arrest, the officer obtained an arrest warrant for the defendant, based on the officer's sworn affidavit as to events occurring before and after the traffic stop. *Id.*

At the suppression hearing, the defendant argued that the officer could not have had probable cause to believe a crime was committed since Delaware's motor vehicle laws did not require a driver to signal when entering a public highway from private property. *Id.* at 1076–77. The officer testified at the suppression hearing, articulating additional factors justifying his traffic stop of the car that had not been included in his sworn affidavit. *Id.* at 1078.

The *McDonald* Court held that the "four corners rule" prevented the trial court from considering factors not identified by a police officer in an *affidavit of probable cause to arrest* when determining whether that officer had *probable cause* to conduct a traffic stop preceding the arrest, noting that the officer's "sworn affidavit ... executed in support of the ... warrant has determinative probative value because it is the only contemporaneous evidence of why he stopped the motor vehicle several hours earlier that day." *Id.* at 1078.

*McDonald* is distinguishable from this case because the *McDonald* Court used one probable cause assertion (the officer's sworn affidavit accompanying an arrest warrant) to assess an officer's earlier assertion of probable cause (the preceding warrantless traffic stop). Here, however, appellant asks us to take one assertion of probable cause (Officer Goodwin's traffic citation) to assess an earlier assertion of reasonable suspicion to conduct a traffic stop. Because reasonable suspicion is a much less demanding standard than probable cause, *see Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581, and, because an officer may develop probable cause to search or arrest for a crime entirely different than the criminal

the State conceded at the suppression hearing that Officer Goodwin's testimony, indicating that he first stopped the car for excessive speeding, would have been insufficient, under *Warren, supra,* to procure a conviction for driving at a speed greater than reasonable under the circumstances, pursuant to § 21–801(a) of the Transportation Code. At the suppression hearing, however, the State's only burden was to show that Officer Goodwin had a reasonable articulable suspicion sufficient to justify his initial investigatory stop of the car. *Muse v. State,* 146 Md.App. 395, 406, 807 A.2d 113 (2002).

Appellant was entitled to argue that Officer Goodwin's decision to charge or not charge certain crimes in the traffic citation cast doubt on his testimony at the suppression hearing. Similarly, the circuit court was entitled to consider and reject this theory based on the evidence before it. As explained, *supra,* we give deference to the circuit court's assessment of the facts and the credibility of the witnesses and we will not reverse its decision absent a showing of clear error; we do not so find here.

In sum, viewing all the evidence in the light most favorable to the State as the prevailing party at the suppression hearing, we perceive no error in the circuit court's determination that the traffic stop that resulted in appellant's arrest and the seizure of evidence was valid under the Fourth Amendment to the United States Constitution.

## II

### A

Appellant's second contention is that the circuit court violated his right to a fair and impartial trial and to due process of law, guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article 24 of the Maryland Declaration of Rights, by repeatedly questioning State's witnesses "in a party-selective manner, evidencing a bias toward

activity originally suspected at the initiation of the stop, we find the *McDonald* holding inapplicable to appellant's case.

the State's position and making a concerted effort to assist the State in presentation of its case-in-chief." The trial judge, in our view, overly injected himself as an inquisitor throughout the testimony of the witnesses, the result of which was to unduly give the perception that he favored the State's version of the factual presentation. With a degree of cerebration, we are constrained to order reversal. We explain.

### (i) Questioning of Officer Goodwin

Officer Goodwin testified, both at the suppression hearing and at trial, that he initiated a traffic stop of the car in which appellant was a passenger at 11:50 p.m. on October 23, 2005. The State's theory of the case was that this traffic stop occurred after the robbery and murder. The testimony of the robbery victims, however, was not easily reconciled with Officer Goodwin's testimony. For example, when the State asked Charlotte Johnson where she was "ten minutes before midnight," she replied that she was sitting on her front porch with Davis and Tycara Johnson and that the robbery occurred around that time. She later testified during cross-examination that the robbery occurred at around 10:30 or 11:00 p.m. Similarly, Davis was asked by the State to testify about the events on October 23, 2005 and "going into the early morning hours of October 24, 2005." Anderson was asked by the State to testify about events that occurred "close to midnight on October 23, 2005." Tycara Johnson responded to the State's question about events that occurred during "the evening hours" of October 23, 2005. It appears that, apart from Charlotte Johnson's testimony during cross-examination, no eyewitness to the robbery made any affirmative statement as to the exact or approximate time that the robbery took place.

At trial, Charlotte Johnson, Lamar Davis and James Anderson were the first witnesses to present testimony. When Officer Goodwin was called to testify at trial, he stated on the record that the traffic stop took place at approximately 11:50 p.m. The trial judge immediately inserted himself into the examination of the witness:

THE COURT: Wait. Sir, *that's the time that's recorded as to an incident occurring and I suspect that this might have occurred later than that incident.* Is there any way you can double check to make sure exactly what time you encountered the car? Like, for example, when you got your central complaint number from the Dispatcher? *You may be giving me an earlier time, is what I'm suggesting.* Can you look it up?

[THE WITNESS]: I would have to go back to the police station and look at the CAD information, but I think the time that was used is the time the actual complaint number was pulled, sir.

THE COURT: But *if the complaint number was pulled because of something that happened earlier that evening,* is there a way that you can reconstruct exactly what time it was that you stopped this vehicle?

[THE WITNESS]: No, sir.

(Emphasis added). Neither appellant nor his co-defendant objected to these questions.

Later, Officer Goodwin was asked by the State about the rifle that was removed from the car subsequent to the stop. Although Officer Goodwin had previously asserted that he stopped the car at 11:50 p.m., the trial court again intervened in the examination of this witness:

THE COURT: [...] While you're doing that—Officer, I'm looking at a document that indicates that this High Point rifle was submitted on 10–24–05. Does that refresh your recollection *as to how long **after midnight you** happened to encounter this vehicle?*

[APPELLANT'S COUNSEL]: *I would object to the Court's question.*

THE COURT: Overruled.

Does that refresh your recollection at all in terms of whether it was 11:50 on the 23rd or whether it was after midnight when you actually saw the vehicle?

[THE WITNESS]: No, it was 11:50 when we actually saw the vehicle and the rifle was submitted just after midnight.

(Emphasis added). Officer Goodwin again reaffirmed, during his cross-examination by appellant, that he stopped the car sometime before 11:50 p.m. on October 23, 2005.

### (ii) **Questioning of Detective Bealefeld**

On March 15, 2007, during Detective Charles Bealefeld's testimony, the following took place before the jury:

[THE STATE]: All right. Now, what is the time that's always printed out on your reports, on your progress reports for this murder?

[THE WITNESS]: It's the dispatch time of call.

[THE STATE]: Okay. What time is that?

[THE WITNESS]: 23:44, I believe it is.

THE COURT: Explain to the jury what you mean by the dispatch time.

[THE STATE]: Do you want to double check your report to make sure exactly—

[THE WITNESS]: The dispatch time is what time, like if you would dial 911, the call is initiated through the 911 system. An operator takes your information. She documents a time. When she dispatches, or he, dispatches that information to a patrol car, it's given another time, and that time was 23:48 hours, 11:48 p.m.

THE COURT: All right. Let me go over this, make sure the jury and I have got it right. *If I'm living down in Brooklyn and I hear gunshots, even I don't see somebody get shot or whatever, if I call them and say, there's gunshots in Brooklyn, that will trigger a dispatch time, and subsequent investigation will get linked on that starting time;* is that about right?

[THE WITNESS]: You can have multiple calls for different incidents.

THE COURT: Uh-huh.

[THE WITNESS]: It's not uncommon to have five or six calls for, for instance, a shooting. People hear gunshots and five or six different people will call. They'll generate a time

for each one of those call[s], and they'll dispatch each one of those calls.

THE COURT: Well, which one will go on the report? What's the time for which the report was called?

[THE WITNESS]: *The one, for instance in this case, the time that was used was when the officers responded and found the body.*

THE COURT: All right. *So we don't know how many minutes before that the actual shooting occurred; is that correct?*

[THE WITNESS]: There was a call that was dispatched—well, there was a call that was generated and *dispatched at 23:25 hours or 11:25 hours,* I believe.

THE COURT: So the shooting couldn't—

[THE WITNESS]: For a shooting in that area.

THE COURT: *So the shooting couldn't have occurred earlier than 11:25, is that right?*

[THE WITNESS]: *Well, that was the first report of gunshots in the area at 11:25.*

(Emphasis added). Neither appellant nor his co-defendant objected during this portion of the trial court's questioning.

During the middle of a series of questions by the State to Detective Bealefeld related to Kornish's pretrial identification of appellant and Patterson, the trial court intervened again with questions related to the timing of events:

[THE STATE]: Now, I noticed that—when was Mr. Kornish shown the photo arrays?

[THE WITNESS]: On December the 14th, 2005. The first array was presented at 23:51 which is 11:51 p.m. And the other array was at 11:58 p.m.

[THE STATE]: Now, let me ask you this. When did this murder happen again?

[THE WITNESS]: October the 23rd.

[THE STATE]: What was the delay? It's almost two months.

[THE WITNESS]: I wasn't notified—I was contacted [by] Mr. Wagster of the Firearms Unit that there was a drug fire hit or the casings recovered at my scene matched a weapon that was recovered on that same date.

[THE STATE]: And that's only then that you then continued to do more in your investigation, I guess?

[THE WITNESS]: Yes, sir.

THE COURT: What was the complaint number for the recovery of the weapon?

[THE WITNESS]: That was 057J13271.

THE COURT: And what was the dispatch time on that one?

[THE WITNESS]: Your Honor, that was an on-view arrest that they reported at 23:50 hours.

THE COURT: And *what's the difference in time between the dispatch of the murder and the dispatch of the recovery of the weapon?*

[THE WITNESS]: *It's two minutes,* Your Honor.

THE COURT: *And what's the distance from one location to the other?*

[THE WITNESS]: Probably air miles, maybe four to five miles. I'm not sure what the—there are several different routes you could take. It would vary in your mileage, I guess.

THE COURT: Thank you. Next question.

[THE STATE]: Thank you. *And just to clarify, the difference between the dispatch time for the murder case and the dispatch of the on-view arrest in terms of recovery of the weapon, that doesn't mean that only two minutes passed between the murder incident and the recovery of the gun?*

[APPELLANT'S COUNSEL]: *Objection.*

THE COURT: Sustained as to the leading nature of the question.

*Can you explain whether or not you think that these incidents occurred two minutes apart or not?*

[APPELLANT'S COUNSEL]: *Objection to the Court's question.*

THE COURT: Overruled.

[THE WITNESS]: I could explain that I believe that they did not occur two minutes [apart].

[APPELLANT'S COUNSEL]: *Objection to the opinion.* May we approach?

THE COURT: *No. Lay opinion.* What in your experience are you looking at in making that judgment?

[APPELLANT'S COUNSEL]: *Your Honor, may we approach?*

THE COURT: *Not until after he answers the question. What are you looking at, sir?*

[THE WITNESS]: What am I looking at?

THE COURT: From your experience as a police officer, *what are you looking at when you say that you don't think these incidents occurred two minutes apart?*

[THE WITNESS]: The witness statements that I obtained.

THE COURT: All right. Now, you want to approach, [appellant's counsel]?

[APPELLANT'S COUNSEL]: Yes, Your Honor.

(Emphasis added). At the bench, the following conversation took place:

[APPELLANT'S COUNSEL]: Your Honor, the last seven questions occurred as [co-defendant's counsel] objected to. *I am objecting to the Court's posturing this case as taking a decided stance to choose a preference for the State.*

If it's clarifying, by otherwise making ambiguities and in so clarifying, *the Court is indicating its preference for the State's position.*

THE COURT: Thank you. I don't believe that clarifying this issue shows a preference for the State. I think it's mutual. *My twenty years of experience tell me that if there's some ambiguity in the times, we're going to get peppered with notes from the jury long after the witnesses*

*are capable of testifying,* so we cannot create side issues or extend the length of the trial (inaudible) *by having witness [sic] explain what's obvious to every lawyer and every policeman, but it's not obvious to the people that don't work in the field how dispatch numbers are obtained, in terms, of timing.* It will prevent the jury from going off on a tangent. Thank you.

(Emphasis added).

Co-defendant's counsel also objected at the bench, arguing that Detective Bealefeld's opinion was impermissibly based on hearsay. The trial court responded:

Well, I think that the rules permit it, and here's how. Under lay opinion coming under 5–701, it only talks about experience rather than opinion based on a scientific certainty. However, 5–703, which I guess covers 701 as well as 702, says that opinions can be based on both admissible and non-admissible evidence, as long as it's regularly relied on. And in any event, all the witness statements that we're talking about are people who have testified and who have been cross examined and the subject matter of those statements that he's talking about have already come into evidence through them. So while, I guess, a more orthodox formulation would be, only ask an expert to rely on something, it's not admissible, if it's something that he relies. I think the Court of Appeals is prepared to say, people offering lay opinions can do the same thing, so I'm going not to give [in] that I generated any element of prejudice into the case. Thank you.

### (iii) Questioning of Tycara Johnson

Before Detective Bealefeld's testimony, but after Officer Goodwin's testimony, Tycara Johnson was called to the stand. Appellant notes in his brief that she "had very little to offer regarding the events on the evening of October 23, 2005." After a brief direct and cross-examination, the State declined any redirect examination. The trial court then intervened with a series of questions:

THE COURT: You were on your own porch alone, right?

[THE WITNESS]: Excuse me?

THE COURT: You were on [your] own porch, alone, is that right?

[THE WITNESS]: On my own porch?

THE COURT: Yeah.

[THE WITNESS]: No.

THE COURT: Where were you?

[THE WITNESS]: Down the street.

THE COURT: All right. And were you on the next porch from where Lamar Davis and Cynthia Johnson were?

[THE WITNESS]: I was on the same porch.

THE COURT: All right. And what instructions did the robbers give you?

[THE WITNESS]: I don't remember.

THE COURT: Did they tell you to lay down?

[THE WITNESS]: No, sir.

THE COURT: All right. Did you see anybody else lay down?

[THE WITNESS]: No, sir.

[APPELLANT'S COUNSEL]: *Your Honor, I'm going to object to the Court's leading questions.*

THE COURT: Overruled.

Did you see anybody else lay down?

[THE WITNESS]: Excuse me?

THE COURT: Did you see anybody else lay down?

[THE WITNESS]: No, sir.

THE COURT: All right. In addition to the three of you that were on the porch, did you see any other person further away on the street lay down at any time?

[THE WITNESS]: No, sir.

THE COURT: And did there come a time as this was happening that you heard gunfire?

[THE WITNESS]: Excuse me?

[CO–DEFENDANT'S COUNSEL]: *Objection.* May counsel approach?

THE COURT: Did you hear any gunfire?

[THE WITNESS]: Yes.

[CO–DEFENDANT'S COUNSEL]: *Objection.* May counsel approach?

THE COURT: You may approach.

(Emphasis added). Both counsel approached the bench and the following ensued:

[CO–DEFENDANT'S COUNSEL]: Your Honor, I know we've had these kind [sic] of discussions before in trial. I know that you believe [sic] are allowed to question, but this particular witness, Your Honor, I object because, you know, the Court has a lot of questions during the trial and I have not objection [sic]. *This one, the State has put on witness, the State asked certain questions, and I quite frankly believe that you're now taking over the State's job on this particular witness on these particular questions that you've asked.*

THE COURT: And what did Harry Davis say in Nance that the Court can do?

[CO–DEFENDANT'S COUNSEL]: Your Honor, I'm quite familiar with what the Court has said and I—

THE COURT: *He said if the Court thinks that the State has faltered in presentation [sic] to the jury and it's going to create management problems for the jury to get the facts out for the jurors [sic] satisfaction, just try to do it in as balanced way as possible so that you don't want to sound like an advocate for one side or the other.*

[CO–DEFENDANT'S COUNSEL]: And that's why I'm objecting this time because earlier times why, and I think the Court knows I'm not shy on objecting, you have—I have not objected to any of your questions previously, but this time I believe the Court is not doing it in a balanced manner.

THE COURT: Well, I'm not going to go so far as to ask her, you know, look at those two guys over there, are they

the robbers. *I'm just trying to get he jury [sic] that she did observe the same facts that the other people did,* **so they don't think that there's a disparity in the facts** *even though none of them are identifying them.*

[CO–DEFENDANT'S COUNSEL]: I think once she was on the same porch, I think that—you got that already, once you got her on the same porch. I think that's all the Court needed. But other questions, I think are going beyond that.

THE COURT: Okay, thank you. Overruled.

[APPELLANT'S COUNSEL]: *Same objection, Your Honor.*

THE COURT: Okay.

(Emphasis added).

The trial court continued to question Johnson for a short while longer, asking her, *inter alia,* if she heard or observed gunfire.

Appellant also noted other instances whereby the trial court questioned witnesses, some of which were followed by appellant's objections.

During jury instructions, the trial court instructed the jury, in pertinent part, as follows:

Members of the jury, the time has come to explain to you the law that applies to this case. The instructions that I give you about the law are binding upon you. In other words, you must apply the law as I explain it to you in arriving at your verdict. On the other hand, any comments that I may make about the facts are not binding upon you and are advisory only. It is your duty to decide the facts and apply the law to those facts.

\* \* \*

*During the trial, I may have commented on the evidence or asked questions of witnesses. You should not draw any inferences or conclusions from my comments [or] questions either as to the merits of the case or as to my views regarding the witness.*

*Usually, when I ask a question, it's because I feel there's an area that hasn't been gone into [to] the satisfaction of*

*the jury, and because I cannot answer questions when you're deliberating by putting another witness on the stand or getting, somehow, an answer for the first time, I try to anticipate those kinds of things that you're going to be wondering about and [sic] them nailed down, even if they're not part of either lawyer's strategy in developing the facts of the case.*

(Emphasis added).

Appellant maintains that, "[a]lthough a trial court is granted some leeway to question witnesses in an impartial manner in order to avoid confusion," such discretion should be used sparingly. According to appellant, the circuit court posed "more than 125 questions to State's witnesses," and "crossed the line from neutral inquisitor to Assistant State's Attorney." Appellant challenges the trial court's questioning of Officer Goodwin and Detective Bealefeld, arguing that the trial court sought to "fill a void in the State's case and establish a timeline that better fit the State's theory of prosecution." Appellant adds that the trial court's repeated intervention at trial resulted, in part, in Detective Bealefeld's improper opinion testimony based on inadmissible hearsay.

The State counters, generally, that appellant failed to contemporaneously object to most of the trial court's questions that appellant now challenges before this Court. As to what was preserved, the State explains that the trial court merely sought to sharpen and clarify ambiguities in the evidence. Finally, the State maintains that, if this Court were to find error in the trial court's actions, this error was harmless, since the "eight occasions where the trial court asked questions of witnesses" were "inconsequential" in light of the strength of the evidence against appellant and the trial court's jury instructions cautioning the jury against drawing any inferences or conclusions from its questioning of the witnesses.

**B**

**PRESERVATION**

It is well-settled that an appellate court will ordinarily not consider any point or question unless it plainly

appears from the record to have been raised in or decided by the trial court *sub judice.* Md. Rule 8–131(a); *Robinson v. State,* 404 Md. 208, 216–17, 946 A.2d 456 (2008). In the context of a trial court's interrogation of a witness, trial counsel must, at the very least, object to the court's question or comment in order to preserve appellate review of the interrogation. *See Brown v. State,* 220 Md. 29, 39, 150 A.2d 895 (1959) (preservation requires an objection, a request that the jury be instructed to disregard the questions and answers, and a motion for mistrial); *McMillian v. State,* 65 Md.App. 21, 26, 499 A.2d 192 (1985) (noting that appellant failed to object to ten of the twelve instances of conduct by the trial judge raised on appeal, waiving appellate review of that conduct); Hon. Joseph F. Murphy, Jr., Maryland Evidence Handbook § 201(A) at 51–52 (3rd ed. 1999)("When the judge's question will prejudice your client, you must object to preserve error").

We also recognize that, when an appellant does not seek to challenge a few, distinct questions posed by the trial court to the witness, but instead seeks to challenge an overall pattern of conduct on the part of the trial court that demonstrates a lack of neutrality, it is unreasonable to expect trial counsel to object each time the trial court decides to intervene. Oftentimes, a *pattern* of conduct only becomes apparent as the proceedings unfold. Moreover, any competent trial counsel is aware that a trial court has broad discretion to ask questions of the witnesses at trial. *See Waddell v. State,* 85 Md.App. 54, 59–60, 582 A.2d 260 (1990); *Leak v. State,* 84 Md.App. 353, 363–64, 579 A.2d 788 (1990); *Nance v. State,* 77 Md.App. 259, 263, 549 A.2d 1182 (1988); *Pearlstein v. State,* 76 Md.App. 507, 515, 547 A.2d 645 (1988). Defense counsel is thus in the unenviable position of having to determine when the trial court's questioning has "gone too far," warranting an objection.

Several decisions rendered by Maryland appellate courts have rejected claims of impropriety of judicial interference in the examination of witnesses on the basis of failure to preserve the issue. *See Woodell v. State,* 223 Md. 89, 162 A.2d 468 (1960) (trial judge's questioning held not to indicate disbe-

lief in one of appellant's answers or in belief in his guilt, notwithstanding failure to object or request mistrial); *Bailey v. State*, 6 Md.App. 496, 252 A.2d 85 (1969) (trial court's questioning did not appear to manifest an opinion adverse to the appellant or to defense upon which he sought to rely, notwithstanding failure to object to alleged "active participation" by the court in questioning two of the State's witnesses.)

In *Chambers v. State*, 81 Md.App. 210, 219, 567 A.2d 458 (1989), the State had agreed with appellant's counsel that it would not ask the witness if she could identify appellant as one of the men who robbed her because counsel did not want to highlight the lapse of time since the robbery as the reason for her inability to make a courtroom identification. Appellant waived any objection by his failure to move for a mistrial until the day following the trial judge's questioning which elicited that the witness was unable to identify the appellant, although she had positively identified him as one of the men who robbed her at a pre-trial line-up. *Id.* at 220, 567 A.2d 458.

In *Bell v. State*, 48 Md.App. 669, 679, 429 A.2d 300 (1981), although appellant alleged that the trial judge asked at least fifty-four questions that manifested an opinion adverse to him, he did not object and the trial judge's questioning was neither extensive nor extraordinary in light of the length of the case and its subsidiary issues:

> In light of all of the testimony in the case, we do not find that the judge's attitude reflected prejudicial unfairness, partiality, or an opinion of guilt. At worst the interrogation appeared to question some of the defenses upon which appellant sought to rely; it did not, however, manifest an opinion adverse to appellant or adverse to those defenses. This would appear to be where the line is drawn. *We admonish any trial judge, however, to avoid brinkmanship and to sin, if at all, on the side of silence.*

(Emphasis added) (internal citations omitted).

We decline to apply the preservation rule in a hypertechnical fashion, foreclosing appellate review of meritorious claims, where the record shows that trial counsel has made

good faith and timely objections and attempted to explain, on the record, counsel's concerns regarding a pattern of questioning by the trial court. In this case, appellant objected generally to the trial court's questioning of Officer Goodwin, Detective Bealefeld and Tycara Johnson.

In addition, at the bench conferences following the objections to the trial court's examination of Detective Bealefeld and Tycara Johnson, appellant's counsel either specifically noted his concern that the court was showing preference for the State's case or adopted objections when raised by co-defendant's counsel. Under the circumstances of this case, appellant has properly preserved for our review the court's impartiality, *vel non.*

## C

### Trial Court's Interrogation of Witnesses

*Prosecution and judgment are two quite separate functions in the administration of justice; they must not merge.* **Judge Learned Hand**

It is well-settled that a presiding judge in a jury trial has discretion to question witnesses in order to ensure that the facts of the case are fully developed. *Nance v. State,* 77 Md.App. at 263–64, 549 A.2d 1182. The principal justification for a trial judge to inject himself or herself into the questioning of a witness is to clarify issues in the case. Under proper circumstances, this is so even if the judge's interrogation bears upon the credibility of a defendant. *Bell,* 48 Md.App. at 678, 429 A.2d 300. *See Madison v. State,* 200 Md. 1, 12, 87 A.2d 593 (1952) (trial court did not err by asking defendant a series of questions that arguably bore on defendant's credibility); *King v. State,* 14 Md.App. 385, 394, 287 A.2d 52 (1972) (trial court asked the appellant, charged with second-degree murder of his common-law wife, a series of questions at conclusion of cross examination, including whether appellant knew how she died and whether appellant saw anybody choke her. Even though the questions bore on the credibility of appellant, they "did not do so improperly nor to

the extent of adversely affecting the appellant's right to a fair trial before the jury or of otherwise depriving him of due process of law.")

The trial court's intervention may be particularly helpful in instances where relevant evidence has not been adduced by counsel or the evidence adduced is unclear or confusing. *Lane v. State,* 60 Md.App. 412, 429–30, 483 A.2d 369 (1984) (in prosecution of theft of property of $300 or more, presiding judge properly examined appellant's daughter as to how she knew that information on an employment verification form was false—information that neither the prosecuting attorney nor appellant's counsel elicited and, "where, as here, *the prior testimony is unclear, evasive or equivocal.*") (emphasis added). *See also Henderson v. State,* 51 Md.App. 152, 158–59, 441 A.2d 1114 (1982) (rejecting appellant's claim that the court's questioning conveyed to the jury that the judge disbelieved the witness and holding that trial judge properly asked friend of appellant's cousin, regarding his description of the murder-er-robber as "real bushy like, sideburns, a light skinned fellow, about six-two or maybe six-three, and he was real skinny," "But you don't know how tall this defendant is, do you?"). *See also McMillian,* 65 Md.App. at 26–27, 499 A.2d 192 (trial court's questions were to "clarify testimony and bring out the full facts," notwithstanding that the court should have used greater restraint in characterizing counsel's question as "ridiculous," then rephrasing it.)

Although a trial judge, when presiding at a jury trial, is not required to sit like the proverbial "bump on a log," the preferable practice is for the court to defer its questioning until after each counsel has concluded his or her examination of the witness. *See Marshall v. State,* 291 Md. 205, 212–13, 434 A.2d 555 (1981) (holding that "[it] is a far more prudent practice for the judge to allow counsel to clear up disputed points on cross-examination, unassisted by the court. In this manner, the judge is most likely to preserve his role as an impartial arbiter, because he avoids the appearance of acting as an advocate.").

 Moreover, "the power to participate in the examination of witnesses ... should be sparingly exercised. Particularly when the questioning is designed to elicit answers favorable to the prosecution, 'it is far better for the trial judge to err on the side of abstention from intervention in the case.' If more than one or two questions are involved, the proper procedure is 'to call both counsel to the bench, or in chambers and suggest what (the judge) wants done.'" *U.S. v. Green,* 429 F.2d 754, 760–61 (D.C.Cir.1970) (internal citations omitted).

 It is also true, however, that, "[i]f a judge's comments during [the proceedings] could cause a reasonable person to question the impartiality of the judge, then the defendant has been deprived of due process and the judge has abused his or her discretion." *Archer v. State,* 383 Md. 329, 357, 859 A.2d 210 (2004) (quoting *Jackson v. State,* 364 Md. 192, 207, 772 A.2d 273 (2001)). Accordingly, trial judges are cautioned to exercise their discretion to question witnesses sparingly, lest they compromise their roles as impartial arbitrators in the eyes of the jury. *See Kelly v. State,* 392 Md. 511, 542–43, 898 A.2d 419 (2006); *Marshall,* 291 Md. at 213, 434 A.2d 555; *Bell,* 48 Md.App. at 678, 429 A.2d 300. In *Bell,* we explained:

> The trial judge's role is that of an impartial arbitrator and that appearance is not generally compatible with an inquisitorial role. It is the better practice for a trial judge to *inject himself as little as possible in a jury case, United States v. Green,* 429 F.2d 754, 760 (D.C.Cir.1970), because of the inordinate influence that may emanate from his position if jurors interpret his questions as indicative of his opinion.
>
> * * *
>
> Yet, if counsel have faltered in their advocacies, it is not improper for a trial judge to be "meticulously careful to make sure that the full facts (are) brought out," *Jefferies v. State,* 5 Md.App. 630, 632, 248 A.2d 807 (1969), or to seek to discover the truth when counsel have not elicited some material fact, or indeed when a witness has not testified with entire frankness. Annot., 84 A.L.R. 1172, 1193 (1933).

Such questioning may even bear upon the credibility of a defendant in a proper circumstance. *Madison v. State*, 200 Md. 1, 12, 87 A.2d 593 (1952); *King v. State, supra* at 394, 287 A.2d 52. *This should be achieved expeditiously, however, if at all, for a protracted examination has a tendency to convey to a jury a judge's opinion as to facts or the credibility of witnesses.* Annot., *supra.*

48 Md.App. at 678, 429 A.2d 300 (emphasis added).

The partiality—or perception thereof—of the judge presiding at a jury trial may manifest itself in several ways. The sheer number of questions asked may signal the judge's disbelief of a witness' testimony. *Vandegrift v. State*, 237 Md. 305, 310–11, 206 A.2d 250 (1965). The questions themselves, *e.g.*, admonishing a witness that he or she is under oath, may convey to the jury the presiding judge's assessment of the witness' testimony. *Marshall*, 291 Md. at 213, 434 A.2d 555. *See also Johnson v. State*, 156 Md.App. 694, 712–13, 848 A.2d 660 (2004) (holding that questions elicited by trial judge were meant to influence negatively the jury's assessment of the appellant's guilt, not to put in clear focus the factual issues the jury was to decide; in addition, the implied admission of guilt they were meant to and did elicit was not properly admissible, because it merely was a variation on an impermissible adverse inference from the spousal adverse testimony privilege).

Although a conviction is rarely reversed on the grounds that the judge has compromised his or her impartiality by intervening in a case, there have been instances where the egregiousness of a trial court's intervention indeed warranted admonishment of the trial court or, even in some cases, a new trial. *Waddell*, 85 Md.App. at 59–60, 582 A.2d 260; *Vandegrift*, at 310–11, 206 A.2d 250 (trial court's questions manifested its disbelief of witness' testimony.) *Brown*, 220 Md. at 39, 150 A.2d 895 (trial judge asked defendant questions calculated to convey his disbelief of defendant's testimony to the jury). Apropos to the analysis at hand, in *Ferrell v. State*, 73 Md.App. 627, 637–38, 536 A.2d 99 (1988), *rev'd on other*

*grounds*, 318 Md. 235, 567 A.2d 937 (1990), Chief Judge Bell currently, of the Court of Appeals, dissenting, wrote:

> Turning to the case *sub judice*, the majority has very considerately characterized the trial judge's actions in this case as stepping in "at several points to clarify questions posed by counsel or to give the witness an opportunity to explain or clarify the alleged inconsistencies." This characterization is not supported by the record. On the contrary, the record discloses that the trial judge, totally oblivious of any bounds, interjected herself repeatedly, into the proceeding. In fact, there were more than a hundred such instances. The judge participated, to some extent, in the questioning of each witness called to testify.
>
> To be fair, some of the trial judge's interjections were innocuous and some were for the purpose of clarifying questions posed by counsel; the vast majority of them, however, were much more serious. A few examples are demonstrative. During the State's case, the court's interventions included participating freely and frequently in the direct examination of witnesses, assisting the assistant State's Attorney in the presentation of his case, when he did not wish help, and, indeed, resisted it; interrupting cross-examination by defense counsel to assist State's witnesses in responding to questions; and explaining the testimony of State's witnesses. *The trial judge also rephrased questions, rather than ruling on objections by defense.* Moreover, in addition to correcting defense counsel in front of the jury and suggesting how questions should be phrased, the trial judge raised objections *sua sponte.* During the defense case, the judge, without regard to, and in fact, in spite of, the defense strategy, cross-examined defense witnesses during their direct examination. *In some instances, the trial judge anticipated issues which had not yet been raised* and, in at least one other, questioned a witness concerning his testimony in a prior trial.

73 Md.App. at 645–48, 536 A.2d 99 (emphasis added).

In *Leak*, 84 Md.App. at 362, 579 A.2d 788, reversing on other grounds, we commented on the fact that the entire

testimony of a defense witness extended over forty pages of transcript and the questioning by the court spanned eight of those forty-five pages. Holding that "it was clear that the purpose of the interrogation was to impeach the witness," we concluded that the trial court had crossed the line:

> Even in the absence of any indication as to intonation, facial expression, or "body language," it is apparent to us from the nature of the questions that the interrogation was not for the purpose of sharpening the issue or bringing out the full facts of the case being tried. We cannot escape the conclusion that the purpose of the interrogation was to impeach the witness. The questions themselves could not fail to convey to the jury the judge's opinion of the witness's credibility. That is not the proper role of a trial judge, who must maintain the appearance of an impartial arbitrator.

*Id.* at 369, 579 A.2d 788.

*In Waddell v. State,* 85 Md.App. 54, 59, 582 A.2d 260 (1990), when the witness explained that he allowed the defendant to carry a gun at work, the trial judge asked in front of the jury, "And you just let him do it?" When defense counsel asked the witness to explain why he let the defendant carry a gun, the witness said he understood why defendant would carry a gun given where he lived. *Id.* The trial court responded, "You know different now." *Id.* Noting that, "[a]lthough the trial judge sometimes inappropriately asked questions and interjected comments," we concluded that we would not have reversed but for the aforementioned interjection:

> The comment that the judge interjected during the supervisor's testimony was so egregious—so inflammatory as it were—that this time we have no choice but to reverse. Through that comment, the judge clearly implied her belief that appellant shot and killed Carlton Robinson. When she did so, she crossed over the line of impartiality and became an advocate for the State. We think that it was impossible for appellant to have had a fair trial under the circumstances.

*Id.* at 60, 582 A.2d 260.

In instances in which the trial court's interrogation of witnesses runs afoul of what exceeds the normal bounds of an

impartial arbiter, but the questioning does not reflect prejudicial unfairness, partiality or an opinion of guilt as to the accused, we then look to the strength of the State's case to determine whether the court's transgression has deprived the defendant of a fair trial. *Smith v. State,* 66 Md.App. 603, 619–20, 505 A.2d 564 (1986). In *Smith,* recognizing that "the trial judge sporadically exhibited a somewhat impatient and intolerant attitude toward counsel," we formulated the proper measure of the court's intervention, which we believe is particularly apropos to the case at hand:

> While acknowledging the discretionary right of a trial judge to question witnesses, it is painfully obvious in the case *sub judice* that the trial judge oftimes overly injected himself as an inquisitor throughout the direct examination of both victims. We hasten to add, however, that the trial judge brought out testimonial clarity in reference to acts of specific assailants.
>
> We have scrupulously combed the transcript of testimony without finding that the trial judge's questions or attitude reflected prejudicial unfairness, partiality or an opinion of guilt as to the accused. In light of the overwhelming evidence which had established the elements of the offenses and the criminal agency of Smith prior to the improper conduct of the trial judge, we believe beyond a reasonable doubt that the court's undue injection into the trial did not have the effect of influencing the verdict of the jury, and was therefore harmless.

*Id.*

From the foregoing, we distill the following principles regarding judicial intervention in the examination of witnesses. (1) The primary purpose of judicial interrogation of witnesses is to clarify matters elicited on direct or cross-examination. (2) Judicial interference in the examination of witnesses should be limited and it is preferable for the trial judge to err on the side of abstention from intervention in the case. (3) Although the number of questions posed by the trial judge exceeds those normally asked by a trial judge, the sheer

number, standing alone, is not determinative of whether reversal is warranted. (4) It is preferable for the presiding judge to afford counsel the opportunity to elicit relevant and material testimony prior to interceding. (5) Continued inquisitorial participation in the questioning of witnesses runs afoul of the court's role as impartial arbiter, whether such questions are proper or improper, when they tend to influence the jury regarding the court's view of the testimony and evidence. (6) The most egregious manner of intervention is the trial court's personal injection of its views and/or attitude toward witnesses or parties or their theory of the case through intimidation, threatening, sarcasm, derision or expressions of disbelief, irrespective of the frequency or the point in time during or at the conclusion of direct or cross-examination of counsel. (7) If the direct and cross-examination of counsel is woefully inadequate, requiring extensive supplementation thereof, the preferred procedure is for the court to summons both counsel to the bench or in chambers and suggest how it wishes to proceed. (8) Greater latitude is granted to a trial judge based on the complexity of a case. *Cardin v. State,* 73 Md.App. 200, 232–33, 533 A.2d 928 (1987); *Pearlstein,* 76 Md.App. at 515–16, 547 A.2d 645.

## D

## The Instant Case

In the case *sub judice,* the essence of appellant's assignment of error is whether the court "departed from its role as a neutral arbiter and elicited testimonial evidence from State's witnesses in a selective manner." To answer this question, we look primarily to the form and language of the court's questions themselves, in the context of the circumstances of this case, examining whether the questions, on their face, reveal any display of partiality. *See Pearlstein,* 76 Md.App. at 516, 547 A.2d 645; *Cardin,* 73 Md.App. at 232, 533 A.2d 928.

From our review of the record, the trial court's questioning of Tycara Johnson and the other isolated instances of the

questioning by the trial court cited by appellant were within the court's discretion to assist the jury in understanding all relevant facts of the case. These questions by the trial court elicited general facts about the circumstances surrounding the crime and were not outside the latitude afforded to judges to clarify material facts in the case.

When viewing the record as a whole, however, we conclude otherwise with respect to the trial court's interrogation of Officer Goodwin and Detective Bealefeld. Our research has failed to uncover prior decisions rendered by Maryland federal or appellate courts in which a trial judge has, in essence, placed words into witnesses' mouths or directed witnesses to testify consistent with the court's understanding of the evidence. At the outset, the court and counsel "teed up" the narrow issue presented in this appeal in the colloquy reproduced, *supra*, wherein counsel complained that he was "objecting to the court's posturing this case as taking a decided stance to choose a preference for the State. If it's clarifying, the court is indicating its preference for the State's position." Denying that his intervention indicated his preference for the State's position, the trial judge, rejoined, " . . . if there's some ambiguity in the times, we're going to get peppered with notes from the jury long after the witnesses are capable of testifying, so we cannot create side issues or extend the length of the trial by having witness[es] explain what's obvious to every lawyer and every policeman, but it's not obvious to the people that don't work in the field how dispatch numbers are obtained, in terms, in terms of timing. It will prevent the jury from going off on a tangent."

At the outset, the court declared its express purpose of clarifying issues when it interrupted the questioning of witnesses by counsel in order to pose its own questions. We acknowledge that the court properly recognized its right to do so, provided its intervention was not overly intrusive. Lest there be any doubt, we do not question the court's motives, only its exuberance and continued inquisitorial demeanor. The record reflects no sarcasm, intimidation, threatening, manifestation of disbelief or incredulity of witnesses or the

defendant's case. Similar to the intrusive actions of the trial judge described in the dissenting opinion in *Ferrell, supra,* at 638, 536 A.2d 99, what the record does reflect, however, are the court's participating freely and frequently in the direct examination of witnesses, essentially assisting the Assistant State's Attorney in the presentation of his case, interrupting cross-examination by defense counsel to assist State's witnesses in responding to questions and explaining the testimony of State's witnesses. The trial judge, in this case, also rephrased questions after sustaining objections by the defense and, in some instances, anticipated issues which had not yet been raised. Most troubling is the fact that the timing of the robbery and the traffic stop were "key" issues in the case. No matter how laudable the court's intentions, it is not the court's role to anticipate every possible question that jurors might subsequently have and preemptively act to "prevent [them] from going off on a tangent."

The excerpted portions of the trial transcript in II A, *supra,* demonstrate that the trial court's questioning blurred the "fine line between assisting the jury by bringing out facts and 'sharpening the issues,' which is permissible, and influencing the jury's assessment of facts or of a witness's credibility by indicating his own opinions, which is not permissible." *Leak,* 84 Md.App. at 363–64, 579 A.2d 788. It is not the mere number of questions posed by the trial court that causes our concern. *See Jefferies v. State,* 5 Md.App. 630, 632–33, 248 A.2d 807 (1969) (the fact that the trial judge asked forty-seven questions of the State's witnesses and 108 questions of defense witness was not, in and of itself, evidence that the defendant received an unfair trial). It is rather the degree to which these questions risked influencing the jury, from their vantage point of viewing the entire proceeding, to adopt what appeared to be the trial court's "point of view" with respect to the facts of the case. We explain.

After Officer Goodwin testified that the stop occurred at 11:50 p.m., the trial court *informed* him "that's the time that's recorded as to an incident occurring and *I suspect* that this might have occurred later than that incident," and *advised* him

that he "may be giving me an earlier time, *is what I'm suggesting.*" (Emphasis added). Despite Officer Goodwin's testimony that the stop occurred at 11:50 p.m., the trial court later asked if his recollection was refreshed as to "how long after midnight" he stopped the car by an exhibit documenting submission of the rifle confiscated. In fact, at no point in his testimony did Officer Goodwin ever relate that the traffic stop occurred *after* midnight. Even though Officer Goodwin did not change his testimony, the form of the trial court's questioning implicitly suggested to the witness that he should change his testimony and alerted both the witness and the jury that the trial court had a definite opinion as to the actual timeline of events in the case.

The trial court then continued to question Detective Bealefeld about the timeline of events, focusing on the dispatch time for the murder, *i.e.*, 11:48 p.m., and the timing of the traffic stop, *i.e.*, 11:50 p.m. Noting that he wanted to "make sure the jury and I have got it right," the trial court posed various questions in narrative form that had the potential to both impermissibly lead Detective Bealefeld's testimony and to alert the jury to the trial court's "point of view."

The impact of this persistent questioning by the trial court was made clear at a later point in Detective Bealefeld's testimony. The trial court asked Detective Bealefeld, over appellant's objection, to address why, in Bealefeld's opinion, there was a two minute difference between the dispatch time for the murder and the traffic stop. Detective Bealefeld opined that the difference in these two times did not indicate that two minutes had elapsed between the actual murder and the traffic stop. The State interjected with a leading question to Detective Bealefeld and, although the trial court sustained appellant's objection to the State's question, the court then proceeded to ask the witness the basis for his opinion, eliciting the answer to the question to which it had just sustained an objection. Detective Bealefeld then testified that he based his opinion on statements he had obtained from witnesses.

Appellant was correct to object to this testimony.[7] While Detective Bealefeld was permitted to offer lay opinion testimony generally, such testimony was required to be limited to "those opinions or inferences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Md. Rule 5–701. The trial court was incorrect to assert that Detective Bealefeld could, under Rule 5–703, offer lay opinion testimony based on the hearsay statements of witnesses.[8] Detective Bealefeld's testimony revealed that his opinion was not based on his first-hand knowledge, but rather on information he had learned from third parties. The mere fact that those third parties were witnesses at trial and available for cross—examination does not change the limitations imposed by Maryland Rule 5–701 on lay opinion testimony. In light of the totality of Detective Bealefeld's testimony, the jury possessed sufficient information to draw inferences regarding the timing of events and the State could have elaborated on this issue, had it chosen to, during closing arguments. It was unnecessary for the trial court to further clarify matters in this instance and its questioning led the

7. Although appellant was correct to object, we note that later, during his cross-examination of Detective Bealefeld, appellant asked the witness what time the crime occurred and Detective Bealefeld responded, "From the information that I received from someone calling 911 at 11:25 p.m., *and Mr. Lamar Davis stating that he was in the house for ten, approximately ten minutes after the robbery before he went out back and saw the body, so anywhere, ten to fifteen minutes prior to that initial dispatch time."* (Emphasis added). Had appellant specifically sought to challenge the admissibility of Detective Bealefeld's lay opinion testimony on appeal, we would have ruled that appellant waived his objection by failing to move to strike Detective Bealefeld's testimony as to Lamar Davis's out-of-court statement. *See Holmes v. State,* 119 Md.App. 518, 523, 705 A.2d 118 (1998). Since, however, the gravamen of appellant's issue here is the trial court's questioning of witnesses, we refer to Detective Bealefeld's lay opinion testimony merely to underline the dangers of over-active questioning by the court.

8. Maryland Rule 5–703 is entitled "Bases of opinion testimony by experts" and authorizes experts to rely on hearsay evidence if the hearsay is of the kind customarily relied on by experts.

witness to offer—and the court to approve of—testimony not authorized under the Maryland Rules.

The trial of a defendant must not only be fair—it must give every *appearance* of being fair. *Scott v. State,* 289 Md. 647, 655, 426 A.2d 923 (1981) (emphasis added). As we have stated previously, trial court questioning "should be achieved expeditiously . . . if at all, for a protracted examination has a tendency to convey to a jury a judge's opinion as to the facts or the credibility of the witnesses." *Bell,* 48 Md.App. at 678, 429 A.2d 300. The trial court's persistent questioning here, however well-intentioned, risked suggesting to the jury that the trial court wanted to elicit facts that fit into a distinct timeline that favored the State's case. As we mentioned, *supra,* the trial court's conduct, to be sure, in no way involved threatening, condescension, sarcasm, derision or visible disbelief of a witness' testimony. *See Vandegrift,* 237 Md. at 310–11, 206 A.2d 250; *Brown,* 220 Md. at 39, 150 A.2d 895. The court's interrogation was, however, acutely suggestive, coercive and manipulative. Neither Officer Goodwin nor Detective Bealefeld were evasive or equivocal witnesses, *c.f. Pearlstein,* 76 Md.App. at 515, 547 A.2d 645, and the trial court's protracted examination of both of these witnesses occurred before completion of direct and cross-examination. Moreover, the narrative and directive nature of the questions had the potential to divert testimony or sway the jury. Accordingly, we hold that, under the circumstances, the trial court abused its discretion in conducting the questioning of Officer Goodwin and Detective Bealefeld and, therefore, risked the appearance of partiality on the part of the court.

Having concluded that the court's questioning risked swaying the jury's fact finding, reversal would be warranted unless we, as a reviewing court, "upon our own independent review of the record, are able to declare a belief, beyond a reasonable doubt, that the error. in no way influenced the verdict." Such error cannot be deemed harmless and reversal is mandated where it influences the jury verdict. *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976). Not every

instance of inappropriate questioning or commenting by a trial court warrants reversal. *Waddell,* 85 Md.App. at 59–60, 582 A.2d 260; *Spencer v. State,* 76 Md.App. 71, 78, 543 A.2d 851 (1988). Where we have reversed convictions in the past, the trial court's comments or questions were so egregious as to be clearly prejudicial, such that a fair trial was no longer possible from that point on. *Waddell,* 85 Md.App. at 59–60, 582 A.2d 260; *Spencer,* 76 Md.App. at 78, 543 A.2d 851.

Patently, the court's interference ran afoul of its role as an impartial arbiter. Although we do not perceive that the trial judge's questions or attitude reflected flagrant and willful prejudicial interference with the examination of witnesses, *Smith, supra,* the court, in its zeal to fit the pieces of the picture presented to the jury together like the pieces of a jigsaw puzzle, deprived appellant of the right to a fair and impartial trial.

Contrary to the State's assertion that the timing of the robbery and the traffic stop were not "key" issues in the case,[9] we are persuaded that members of the jury could very well have reached their verdict based, at least in part, on the timeline. The court was persistent and relentless in insisting that Officer Goodwin conform his testimony to the court's interpretation of the evidence. More importantly, despite the court's admonition to counsel that it did not believe that "clarifying this issue shows a preference for the State," the conclusion that the court's overall demeanor did indeed signal that it was assisting the prosecution in the presentation of its case is inescapable. In addition to the inquisitorial questioning, the trial judge's statement, ". . . Sir, that's the time that's recorded as to an incident occurring and *I suspect* that this might have occurred later than that incident," was both suggestive and a personalization of the inquiry. Although Officer Goodwin did not change his testimony regarding the timing of

**9.** The timing of the robbery was part of appellant's theory of the case and appellant referenced the timeline of events during his closing arguments. Even if appellant had not made the timing of these events a "key" issue, the trial court arguably did through its persistent questioning.

the traffic stop as a result of the trial court's questions, the cumulative effect of the intrusive and inquisitorial interference with the examination of witnesses throughout ineluctably compels reversal in this case.

We pause to observe that trial courts are well advised to be cautious in the exercise of their discretion in the examination of witnesses, "avoid[ ing] brinkmanship and ... sin[ning], if at all, on the side of silence." *Bell*, 48 Md.App. at 679, 429 A.2d 300. Although trial courts are not expected to remain mute during trials, neither should they allow themselves to participate in trials in a manner that calls into question their impartiality and whether a defendant has been denied a trial by a fair and impartial arbiter.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**